# CASE NO. 11-3333

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

————————

Marvel Characters, Incorporated, Marvel Worldwide, Incorporated,
MVL Rights, LLC,
*Plaintiffs-Counter-Defendants - Appellees,*
Walt Disney Company, Marvel Entertainment, Incorporated,
*Counter-Defendants - Appellees,*
v.
Lisa R. Kirby, Neal L. Kirby, Susan N. Kirby, Barbara J. Kirby,
*Defendants-Counter-Claimants - Appellants.*

————————

### APPELLANTS' PETITION FOR REHEARING OR REHEARING EN BANC
————————

Appeal From The United States District Court for the Southern
District of New York,
Civil Case No. 10-141 (CM) (KF), Hon. Colleen McMahon

————————

TOBEROFF & ASSOCIATES, P.C.
Marc Toberoff
 *mtoberoff@ipwla.com*
22237 Pacific Coast Highway #348
Malibu, California 90265
Telephone:   (310) 246-3333
Facsimile:    (310) 246-3101

*Attorneys for Defendants-Appellants,*
*Lisa R. Kirby, Neal L. Kirby, Susan M.*
*Kirby and Barbara J. Kirby*

# **TABLE OF CONTENTS**

RULE 35 STATEMENT ......................................................1

INTRODUCTION ...........................................................1

BACKGROUND ............................................................3

ARGUMENT ................................................................5

I.    THE RULE 19(b) ANALYSIS WAS BASED ON AN
      ERRONEOUS READING OF THE RECORD AND
      MISAPPLIED THE 19(b) FACTORS ALL OF WHICH
      WEIGH IN FAVOR OF DISMISSAL ......................................5

      A.    The Opinion Misapplies The First Factor (Prejudice) ....................5

      B.    The Opinion Misapplies The Second Factor (Alleviation
            of Prejudice) ...........................................................9

      C.    The Opinion Misapplies The Third Factor (Judgment
            Adequacy) ..............................................................9

      D.    The Opinion Misreads The Record Re: Fourth Factor
            (Adequate Remedy) .................................................. 10

II.   GIVEN THE UNDISPUTED FACTS FOUND BY THE COURT
      KIRBY'S CREATIONS COULD NOT BE WORK FOR HIRE ........... 12

      A.    The "Instance and Expense" Test Should Be Narrowly
            Construed ............................................................. 19

CONCLUSION .............................................................. 20

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

EXHIBIT 1: PANEL DECISION

i

# TABLE OF AUTHORITIES

## Federal Cases

*American Optical Co. v. Curtiss*,
59 F.R.D. 644 (S.D.N.Y. 1973) ...............................................................7

*Brattleboro Publ'g Co., v. Winmill Publ'g Corp.*,
369 F.2d 565 (2d Cir. 1966) ................................................................ 14

*Brattleboro Publishing Co., v. Winmill Publ'g Corp.*,
250 F. Supp. 215 (D. Vt. 1966) .......................................................... 14

*Cable Vision, Inc. v. KUTV, Inc.,*
335 F.2d 348 (9th Cir. 1964) ................................................................6

*CP Solutions PTE, Ltd. v. Gen. Elec. Co.*,
553 F.3d 156 (2d Cir. 2009) ......................................................... 2, 8, 9

*Community for Creative Non-Violence v. Reid*,
490 U.S. 730 (1989) ............................................................... 17, 19, 20

*Cusano v. Klein*,
196 F. Supp. 2d 1007 (C.D. Cal. 2002) ..............................................7

*Dolman v. Agee*,
157 F.3d 708 (9th Cir. 1998) ............................................................. 18

*Epoch Producing Corp. v. Killiam Shows, Inc.*,
522 F.2d 737 (2nd Cir. 1975) ............................................................ 16

*Estate of Hogarth v. Edgar Rice Burroughs, Inc.,*
342 F.3d 149 (2d Cir. 2003) ................................................... 13, 14, 18

*Estate of Hogarth v. Edgar Rice Burroughs, Inc.,*
*2002 U.S. Dist. LEXIS 4219* (S.D.N.Y. Mar. 15, 2002) .................... 14

*Felix Cinema. v. Penth'se Int'l, Ltd.*,
99 F.R.D. 167 (S.D.N.Y. 1983) ........................................................ 11

*Fifty-Six Hope Rd. Music Ltd.,*
2010 U.S. Dist. LEXIS 94500 (S.D.N.Y. 2010) ................................................. 14

*First Fin. Mktg. Servs. Grp., Inc. v. Field Promot'ns, Inc.,*
286 F. Supp. 295 (S.D.N.Y. 1968) ....................................................................7

*Fuji Photo Film Co. v. Deep Creek Design,*
1998 U.S. Dist. Lexis 19525 (S.D.N.Y. 1998) ................................................. 12

*Gary Friedrich Enterprises, LLC v. Marvel Characters, Inc.,*
716 F.3d 302 (2d Cir. 2013) ............................................................................. 18

*Global Disc't Travel Servs., LLC v. TWA,*
960 F. Supp. 701 (S.D.N.Y. 1997) ................................................................... 11

*Harper & Row Publ'rs, Inc. v. Nation Enterp's,*
471 U.S. 539 (1984) ............................................................................... 2, 12, 13

*Jaser v. N.Y. Prop'ty Ins. Underwrit'g Assoc.,*
815 F.2d 240 (2d Cir. 1987) ........................................................................... 8, 9

*Key W. Hand Print Fabrics, Inc. v. Serbin, Inc.,*
244 F. Supp. 287 (S.D. Fla. 1965) ....................................................................7

*Martha Graham School & Dance Foundation, Inc. v. Martha Graham Center of Contemporary Dance, Inc.,*
380 F.3d 624 (2d Cir. 2004) ............................................................ 13, 15, 16, 18

*Marvel Characters, Inc. v. Simon,*
310 F.3d 280 (2d Cir. 2002) .............................................................. 2, 4, 18, 20

*McCarthy v. Am. Int'l Group,*
283 F.3d 121, 124 (2d Cir. 2002) .................................................................... 18

*Messerschmitt-Boelkow-Blohm v. Hughes Airc'ft Co.,*
 483 F. Supp. 49 (S.D.N.Y. 1979) ......................................................................6

*Nat'l Union Fire Ins. Co. v. Int'l Wire Grp. Inc.,*
2003 WL 21277114 (S.D.N.Y. 2003) ............................................................... 12

*N.Y. Times v. Tasini,*
533 U.S. 483 (2001).................................................................... 2, 20

*Northern Arapaho Tribe v. Harnsberger,*
697 F.3d 1272 (10th Cir. 2012).............................................9

*Philippines v. Pimentel,*
553 U.S. 851 (2008)................................................................ 2, 9, 10

*Playboy Enterprises, Inc. v. Dumas,*
53 F.3d 549 (2d Cir. 1995)............................................ 14, 15, 16, 18

*Plunket v. Estate of Conan Doyle,*
2001 U.S. Dist. LEXIS 2001 (S.D.N.Y. Feb. 22, 2001).....................7

*Prescription Plan Serv. Corp. v. Franco,*
552 F.2d 493 (2d Cir 1977).......................................................... 2, 8, 9

*Provident Tradesmens Bank & Trust Co. v. Patterson,*
390 U.S. 102 (1968)............................................................. 2, 5, 6, 10

*Pulitzer-Polster v. Pulitzer,*
784 F.2d 1305 (5th Cir. 1986) ..............................................6

*Ronson Corp. v. First Stanford Corp.,*
48 F.R.D. 374, 377 (D. Conn. 1970) .............................. 10

*Scott v. Paramount Pict's Corp.,*
449 F. Supp. 518 (D.D.C. 1978) ...........................................7

*Shapiro, Bernstein & Co. v. Jerry Vogel Music Co.,*
161 F.2d 406 (2d Cir. 1946)...................................................... 15, 18

*Siegel v. Time Warner Inc.,*
496 F. Supp. 2d 1111 (C.D. Cal. 2007) ............................... 16

*Smith v. Kessner,*
183 F.R.D. 373 (S.D.N.Y. 1998) ................................... 11

iv

*Stewart v. Abend*,
495 U.S. 207 (1990) ...................................................................... 16, 20

*Tullett Prebon PLC v. BGC Partners, Inc.*,
427 Fed. Appx. 236 (3d Cir. 2011) ................................................ 6, 7

*Twentieth Century Fox Film Corp. v. Entertainment Distribution*,
429 F.3d 869 (9th Cir. 2005) ............................................... 14, 15, 16

*U.S. ex rel. Hall v. Tribal Dev. Corp.*,
100 F.3d 476 (7th Cir. 1996) .............................................................9

*Vance v. Amer'n Soc. of Composers, etc.*,
271 F.2d 204 (8th Cir. 1959) ............................................................7

*Whitney, Atwood, Norcross Assocs., Inc. v. Architects Collaborative ,Inc.*,
1991 U.S. Dist. LEXIS 225 (D. Mass. 1991) ......................................7

## Federal Statutes and Rules

17 U.S.C. § 26 ........................................................................ 13, *passim*

17 U.S.C. §304(c) ......................................................... 1, 3, 4, 10, 15

17 U.S.C. § 304(c)(1) ................................................................... 10

17 U.S.C. § 304(c)(2) ................................................................ 8, 10

17 U.S.C. §§ 304(c)(2)(B) .............................................................5

17 U.S.C. §§ 304(c)(6)(C) .............................................................5

17 U.S.C. §304(c) ........................................................................ 20

17 U.S.C. §304(d) ....................................................................... 20

17 U.S.C. § 505 ...........................................................................6

28 U.S.C.§ 1404 ......................................................................... 12

28 U.S.C.§ 1406.................................................................... 12

Fed. R. Civ. P. 19(b) ........................................................... 1, *passim*

Fed. R. Civ. P. 21 ..................................................................9

## **Treaties and Other Authorities**

M. Nimmer & D. Nimmer, *Nimmer on Copyright* (2013)
1 *Nimmer* § 5.03[B][1][a][ii] ............................................... 19

1 *Nimmer* § 5.03[B][2][c] ..................................................... 16, 17

1 *Nimmer* § 5.03[B][2][d] ..................................................... 15, 16

3 *Nimmer* § 9.03[D] .............................................................. 19

3 *Nimmer* § 12.03..................................................................7

W. Patry, *Patry on Copyright* ("*Patry*")
2 *Patry* § 5:54...................................................................... 15, 19

Rest. (2d) of Judgments, § 54 (1982).................................8

7 C. Wright & A. Miller, *Fed'l Pract. and Proc.*, § 1614 (2013) ......................7

## RULE 35 STATEMENT

The soon to be published Opinion (Ex. 1), conflicts with Supreme Court and Second Circuit precedent, and raises questions of exceptional jurisprudential importance warranting rehearing and rehearing en banc. *First*, where the Court lacks personal jurisdiction over two of four copyright co-owners, should it determine copyright ownership when the absentees will be severely prejudiced, and all the Fed. R. Civ. P. 19(b) factors favor dismissal? *Second,* should the controversial "instance and expense" test for "work for hire" under the 1909 Copyright Act (repealed) be narrowly construed because it conflicts with the common law of agency, and its elastic application cripples 17 U.S.C. §304(c)?

## INTRODUCTION

This case concerns the exercise of copyright termination rights under 17 U.S.C. §304(c) by the four children of legendary comic book creator Jack Kirby, as to his most prominent artistic works published by Marvel in 1958-63, including *The Fantastic Four*, *The Incredible Hulk*, *Thor*, and *X-Men*.

Regarding the first question, the Opinion is marred by a critical error as to the factual record leading to the mistaken conclusion that if this case is dismissed under Rule 19, Marvel has no adequate remedy. The record reflects that all four Kirby heirs had filed suit to enforce their statutory rights in California (C.D. Cal. Case No. 10-00289, CJC (AN)), where two of the three Marvel plaintiffs, their

1

parent, Disney, Lisa and Neal Kirby, the Kirby Trust, and the Kirbys' counsel, *all* reside. The resulting Opinion that the absent Kirbys are not "indispensable" under Rule 19(b) contradicts *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 111 (1968), *Philippines v. Pimentel*, 553 U.S. 851, 870-871 (2008), and the cases, *CP Solutions PTE, Ltd. v. Gen. Elec. Co*., 553 F.3d 156 (2d Cir. 2009) and *Prescription Plan Serv. Corp. v. Franco*, 552 F.2d 493 (2d Cir 1977) on which the Opinion relies. This motion is warranted to fully brief the critical Rule 19(b) issue, which Appellants did not expect this Court to decide in the first instance.

As to the second question, the Opinion found that Jack Kirby's freelance creations were "work-for-hire" as a matter of law based on Marvel's discretionary payment for only that material it wished to publish. This conflicts with the fundamental principle that an employer's authorship of "work for hire" adheres at creation. *Harper & Row Publ'rs, Inc. v. Nation Enterprises*, 471 U.S. 539, 547 (1984). Abundant evidence in the record pointed to Marvel's purchase and Kirby's assignment of his material – the antithesis of "work for hire" – which presents no legal conflicts, and, at a minimum, raised key disputed issues for the trier of fact.

The Opinion also contravenes the concerted legislative objective of the termination right to "enhance the author's position" and remedy "the author/publisher [im]balance." *N.Y. Times v. Tasini,* 533 U.S. 483, 496, n.1 (2001). *See Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 290 (2d Cir. 2002).

## **BACKGROUND**

Defendants Lisa, Neal, Barbara and Susan Kirby (the "Kirbys") are the children of artist/creator Jack Kirby.  In September 2009, they exercised their right under 17 U.S.C. § 304(c), to recover their father's copyrights in characters he co-created as a freelancer from 1958-1963 (the "Period"), by serving Marvel with notices of termination of his copyright assignments ("Termination").[1]

In 1958-63, Jack Kirby created and sold his artwork to Marvel on a purely freelance basis. Br. 7.  He worked from home, set his own hours, and paid all overhead/expenses of creating his artwork, which Marvel did not reimburse.[2] Kirby was not paid for his services, but a page rate for only that product Marvel chose to purchase in its sole discretion.  Br. 7, 34, Reply 1-3. When Kirby's submissions were rejected he was not compensated, and took the entire loss.  *Id*. Marvel also did not pay for material it wanted redrawn as a purchase condition. Br. 7-8, Reply 9-10.  Kirby freely sold to other publishers.  Kirby freely used rejected work done for a Marvel project in work he sold to its competitors.  Br. 8.

In 1958-1963, Marvel avoided any legal engagement agreement or legal obligation to Kirby.  Br. 8.  Kirby was also not legally obligated to Marvel to create material.  *Id*.  The only contemporaneous agreements between Marvel and

---

[1] Appellants' Opening Brief ("Br.") 3, 9.

[2] Appellants' Reply Brief ("Reply") 12.  Marvel also did not withhold any taxes from its payments, nor provide Kirby with any benefits.  Br. 8.

Kirby were contractual legends on the back of Marvel's checks, expressly assigning Kirby's copyrights in the artwork Marvel purchased. Br. 5, 47-48; Reply 20-22. The first formal contract, dated June 5, 1972, was titled "Assignment," and again assigned Kirbys' material to Marvel. Joint Appendix ("JA")(III) 603-08.

On January 8, 2010, Marvel filed suit in New York, though two of three Marvel plaintiffs, their owner, Disney, Lisa and Neal Kirby, the Kirby Trust all reside in California. JA(I) 21, 68, 72, 76. Marvel contested the Termination, claiming "work for hire" – the sole exclusion to 17 U.S.C. § 304(c). JA(I) 19-35.

On March 9, 2010, all four Kirbys filed suit in the Central District of California against Marvel and Disney to enforce their Termination. Br. 22. The same day, they moved to dismiss this action for lack of personal jurisdiction over Lisa and Neal Kirby. The district court denied their motion and wrongly asserted personal jurisdiction over all the Kirbys. JA(I) 36-38, 95-110.

The district court granted Marvel's motion for summary judgment. Special Appendix ("SA")1-52. The Kirbys raised several issues on appeal including that the district court lacked jurisdiction over two of the four indispensable Kirbys, and flouted summary judgment standards by deciding fact disputes and drawing all inferences in Marvel's favor. SA 3-52. After finding that Marvel's case "stands or falls on [Lee's] testimony," it accepted it, though the record put his credibility in sharp dispute. SA 7. It also contravened *Simon*, 310 F.3d at 290-292, in holding that

4

a "for hire" acknowledgement, decades after creation, was "conclusive." SA 40.

The Opinion affirmed; vacated the judgment as to Lisa and Neal Kirby for lack of personal jurisdiction; but held them not indispensable under Rule 19(b) despite their co-ownership of the copyrights at issue and the prejudice they suffer.

## **ARGUMENT**

## I.    **THE RULE 19(b) ANALYSIS WAS BASED ON A MISTAKEN READING OF THE RECORD AND MISAPPLIED THE 19(b) FACTORS ALL OF WHICH WEIGH IN FAVOR OF DISMISSAL**

The Opinion that Lisa and Neal, co-owners of the copyright termination interests, were not "indispensable parties" misapplies Rule 19(b).  Under 19(b), the following factors are determinative and *all* weighed heavily in favor of dismissal:

> (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties; (2) the extent to which any prejudice could be lessened or avoided…; (3) whether a judgment rendered in the person's absence would be adequate; and (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

### A.    The Opinion Misapplies The First Factor (Prejudice)

As to an absent party, the Supreme Court directs:

> [T]he court must consider the extent to which the judgment may "as a practical matter impair or impede his ability to protect" his interest in the subject matter. When a case has reached the appeal stage the matter is more complex. … however, a court of appeals should, on its own initiative, take  steps to protect the absent party ...

*Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 111 (1968).

Ordinarily, under 17 U.S.C. §§ 304(c)(2)(B) and (6)(C), all four Kirbys

would co-own the termination interest, and a majority would be required to both exercise the termination right, and exploit the copyrights thereby recovered. Accordingly, from an *ex ante* or *ex post* perspective, judgment in Lisa and Neal's absence threatens to "deadlock" their rights.[3]  The Opinion "assume[s] without deciding [if it] is correct," that an adverse judgment causes Lisa and Neal to "lose" their statutory interest, and that they "stand to have their legal rights finally determined in their absence."  Op. 28, 30. This heavily favors dismissal as it far exceeds the "might prejudice" threshold, and more than "'impede[s]'" the absentees "ability to protect" their legal interest.  *Provident,* 390 U.S. at 111.[4]

For this reason, it is well-settled that the failure to join the owner or co-owners of a contested copyright should result in dismissal under Rule 19(b).  *See Cable Vision, Inc. v. KUTV, Inc.,* 335 F.2d 348, 353-354 (9th Cir. 1964) ("It is settled law that the copyright owner is an indispensable party to enforcement of a copyright claim."); *Tullett Prebon PLC v. BGC Part'rs, Inc*., 427 Fed. Appx. 236,

---

[3] The decision, also prejudices them as negative precedent.  *See Pulitzer-Polster v. Pulitzer*, 784 F.2d 1305, 1310 (5th Cir. 1986) ("negative precedent can provide the requisite prejudice" under 19(b)); *Messerschmitt-Boelkow-Blohm v. Hughes Airc'ft Co*., 483 F. Supp. 49, 52-53 (S.D.N.Y. 1979)("prejudicial…persuasive effect").

[4] The Opinion incorrectly found no prejudice to existing parties Barbara and Susan. While all the Kirbys would share in any upside, Barbara and Susan, alone, would be responsible for all litigation expenses and any downside (*e.g*., 17 U.S.C. § 505, allowing prevailing party to seek legal fees/costs).  *See Provident*, 390 U.S. at 110 (1968) (existing "party may properly wish to avoid … sole responsibility for a liability he shares with another.").

6

239-240 (3d Cir. 2011) (Rule 19(b) dismissal as action will impair ability "of intellectual property" co-owners to protect their interests); *Vance v. Amer'n Soc. of Composers, etc*., 271 F.2d 204, 208 (8th Cir. 1959)(dismissal as co-owners "are manifestly indispensable parties" to suit which could "divest the[m]" of copyright); 3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* ("*Nimmer*"), § 12.03 Indispensable Parties, at 12-68 ("[J]oinder should occur if an issue is raised as to the validity of the copyright upon which the rights of the person to be joined, as well as those of the plaintiff, rest.").[5]

---

[5] *Id*. at 12-69 ("A number of cases have held that co-owners of a joint work were indispensable parties…"); 7 C. Wright & A. Miller, *Fed'l Pract. and Proc.*, § 1614 ("[W]hen the patent or copyright is jointly owned all proprietors have been viewed as indispensable parties…"); *Plunket v. Est. of Conan Doyle*, 2001 U.S. Dist. LEXIS 2001 at *8, 20-21 (S.D.N.Y. 2001)(heirs are "indispensable parties" where "[i]t is evident that determining plaintiff's declaratory judgment claim [*re: notice of termination*] could affect the[ir]interests in the Literary Properties"); *Amer'n Opt'l Co. v. Curtiss*, 59 F.R.D. 644, 648 (S.D.N.Y. 1973) (As "patent ownership would be undercut" by a verdict, and "would rob [absentee co-owner] of all but nominal indices of ownership," he is an "indispensable party."); *First Fin. Mktg. Servs. Grp., Inc. v. Field Promot'ns, Inc.*, 286 F. Supp. 295, 298 (S.D.N.Y. 1968) ("It is familiar law that the copyright owner is an indispensable party to a suit where the validity of his copyright is in issue."); *Scott v. Paramount Pict's Corp.*, 449 F. Supp. 518, 520 (D.D.C. 1978) *aff'd*, 607 F.2d 494 (D.C. Cir. 1979)(co-authors "are indispensable parties" as "an adverse judgment…would certainly affect their interests."); *Whitney, Atwood, Norcross Assocs., Inc. v. Arch'ts Collab'tive, Inc*., 1991 U.S. Dist. LEXIS 225 (D. Mass. 1991)( Copyright owner is indispensable as action concerns copyright validity.); *Cusano v. Klein*, 196 F. Supp. 2d 1007, 1015 (C.D. Cal. 2002)(dismissal due to failure to join alleged copyright co-owner); *Key W. Hand Print Fab'cs v. Serbin, Inc*., 244 F. Supp. 287, 288 (S.D. Fla. 1965) *aff'd*, 381 F.2d 735 (5th Cir. 1967) (dismissal due to failure to join indispensable copyright co-owner).

The Opinion disregards all this, based on (1) the assumption that Kirby's children have "identical" interests; (2) that they had the same counsel; and (3) selective quotes from *CP Solutions PTE, Ltd. v. Gen. Elec. Co*., 553 F.3d 156 (2d Cir. 2009) and *Prescription Plan Serv. Corp. v. Franco*, 552 F.2d 493 (2d Cir 1977), where the facts and Rule 19(b) analyses differ greatly from this case.

While equal co-owners, the four Kirby heirs do not have "identical" interests.  Each possesses a separate interest under 17 U.S.C. § 304(c)(2), and has a mind of his/her own. As a majority is required to exercise and exploit the termination interest, there are inherent conflicts should they disagree. Rest. (2d) of Judgments, § 54 (1982) ("the very relationship of co-ownership is a source of continuing potential conflict").  Each could retain separate counsel at any time.

Respectfully, the Opinion's reliance on *CP Solutions* is misplaced. There, the absentee defendant was *a subsidiary* of an existing party, the plaintiff offered to amend the complaint to name only the parent, and the subsidiary could suffer no prejudice as it "was dissolved and had no assets." 553 F.3d at 160.  Unlike here, prejudice was non-existent.  Likewise, in *Prescripion Plan,* where existing defendants were 10 of 12 trustees of a pension plan, there was no prejudice to two absentee trustees because "any judgment … would almost certainly be satisfied out of the Plan's, not the individual's assets."  552 F.2d at 497.  Moreover, "[Plaintiff] ha[d] no satisfactory alternative forum outside of New York," *id*., unlike here.

Similarly, *Jaser v. N.Y. Prop'ty Ins. Underwrit'g Assoc.*, 815 F.2d 240,242 (2d Cir. 1987) held that non-diverse association members were not indispensable as any prejudice could easily be avoided, whereas refusing to allow the plaintiff to exclude them would leave him with no remedy, as his claim would be time barred.

In sharp contrast to these cases,[6] Lisa and Neal stand to lose their statutory rights and, as shown in section D below, the Central District of California provided a ready and more appropriate forum with jurisdiction over all the parties.

B.    The Opinion Misapplies The Second Factor (Alleviation of Prejudice)

After noting that a judgment could "[not] be crafted to alleviate [] prejudice" the Opinion suggests this is "irrelevant."  Op. 28-29.  But when courts cannot alleviate prejudice, this factor too weighs in favor of dismissal.[7]

C.    The Opinion Misapplies The Third Factor (Judgment Adequacy).

[Rule 19 (b)'s third criterion] refers to the "public stake in settling disputes by wholes, whenever possible." *Provident Bank*, 390 U.S., at 111… This "social interest in the efficient administration of justice and the avoidance of multiple litigation" is an interest that has "traditionally been thought to

---

[6] *CP Solutions*, *Prescription Plan* and *Jaser* all concern the exclusion of a non-diverse party *to preserve jurisdiction*, where the policy concerns are different.  Fed. R. Civ. P. 21; *Jaser,* 815 F.2d at 242 ("very few cases should be terminated due to the absence of nondiverse parties"); *Prescripion Plan*, 552 F.2d at 496 (same).

[7] *See., e.g.*, *Northern Arapaho Tribe v. Harnsberger*, 697 F.3d 1272, 1282-83 (10th Cir. 2012)("[I]n light of the nature of the interests … there would be no way to lessen or avoid the prejudice. Thus, this factor too weighs in favor of dismissal."); *U.S. ex rel. Hall v. Tribal Dev. Corp.*, 100 F.3d 476, 480 (7th Cir. 1996) ("The second factor also cuts [in favor of dismissal]…There is no middle ground.").

support compulsory joinder of absent and potentially adverse claimants."
*Illinois Brick Co*., 431 U.S., at 737-738 … Going forward with the action
without the [absentee party] would not further the public interest in settling
the dispute as a whole because the[y] would not be bound by the judgment…

*Philippines v. Pimentel*, 553 U.S. 851, 870-871 (U.S. 2008). The decision does not

adequately settle this matter because it does not bind Lisa or Neal who, as the

Opinion notes, are unlikely to accept it "as the last word in the dispute." Op. 29.

Consequently, there is a near certainty of multiple lawsuits and the potential for

inconsistent judgments.[8] *See Provident*, 390 U.S. at 110 (1968) (noting objective

of Rule 19(b) "to avoid multiple litigation, or inconsistent relief").[9]

D.     The Opinion Misreads the Record Re: Fourth Factor (Adequate Remedy)

The Kirbys stated in their opening appellate brief:

As to the fourth F.R.C.P. 19(b) factor (whether plaintiff has an
"adequate remedy" if case dismissed), ***all of the Kirbys consented to
the jurisdiction of the Central District of California*** (JA(I) 46-47),
providing Marvel/Disney with an  alternate and more appropriate forum.

Br. 22 (Emphasis added). All four Kirbys were not only amenable to jurisdiction,

---

[8] The Opinion hypothesizes that judgment against Barbara and Susan might also
decide the matter as to Lisa and Neal. Op. 30. Though the decision severely
prejudices Lisa and Neal, they can, still file suit under an alternate reading of the
statute. Per 17 U.S.C. §304(c)(1), (2), if an author dies termination may be
effected by those statutory heirs "who own…more than one-half of …[the]
termination interest." Since the Opinion adjudged that "Barbara and Susan, are …
without termination rights under section 304(c)" (Op. 57), Lisa and Neal can claim
100% of the termination interest and file suit for enforcement of their Termination.

[9] *Ronson Corp. v. First Stanf'd Corp*., 48 F.R.D. 374, 377 (D. Conn. 1970) ("Where
judgment…would [] result in a new lawsuit by the absentee, it is not adequate.").

they filed suit in California because their attorney, Lisa and Neal, all reside in California, and Lisa, trustee of the Kirby Trust, a California trust, has historically managed the family's affairs. JA(I) 46-47, 64, 68, 9, 72, 76-77.

The Opinion missed this, citing instead to Marvel's brief (56-57), which misleadingly omitted it. Indeed, due to this error, the Opinion did not appreciate that a California forum offers a far more complete remedy. Marvel would not be prejudiced as two of the three Marvel plaintiffs are headquartered in California, and the third regularly conducts business there. JA (1) 21. Marvel's parent, Disney, is likewise headquartered in California. Br. 10.

Due to this misreading of the factual record the Opinion accorded great weight to Marvel's baseless contention that it would be deprived of an adequate remedy (Op. 32). On the full record, Rule 19(b)(4) favors dismissal.[10]

Also weighing in favor of dismissal, was Marvel's blatant forum shopping. The parties were in the midst of initial settlement discussions in mid-December, 2010, when, without warning, Marvel filed in New York right after the Holidays. Br. 9-10. After sidetracking the Kirbys, Marvel raced to an inconvenient forum where it thought the precedent most favorable, re-clothed itself as "Plaintiff" and

---

[10] *Smith v. Kessner*, 183 F.R.D. 373, 376 (S.D.N.Y. 1998) ("The factor that weights most clearly in favor of [19(b)]dismissal is the availability of an alternate, more appropriate forum …"); *Global Disc't Travel Servs., LLC v. TWA*, 960 F. Supp. 701, 710 (S.D.N.Y. 1997) (dismissed, "satisfactory alternative exists"); *Felix Cinema. v. Penth'se Int'l, Ltd*., 99 F.R.D. 167, 172–73 (S.D.N.Y. 1983) (same).

drove up the Kirbys' costs.[11] Given that California was the more appropriate forum

with jurisdiction over all parties, the district court should have transferred the case

under 28 U.S.C.§§ 1404,1406 to eliminate the prejudice to the Kirbys.

## II.    GIVEN THE UNDISPUTED FACTS FOUND BY THE COURT KIRBY'S CREATIONS COULD NOT BE "WORK FOR HIRE"

The  Opinion found that the following critical facts were undisputed and

supported by the record:  In 1958-63, (i) Kirby worked out of his home and paid all

expenses and overhead of creating his artwork, which Marvel did not reimburse;

(ii) Marvel had no written agreement engaging Kirby's services and no legal

obligation to pay for his work; (iii) Marvel was free to reject Kirby's artwork, and

did not pay for material it rejected or wanted redrawn;  (iv) Marvel paid Kirby by

check at a page rate for that material Marvel accepted in its sole discretion.  Op. 7,

52 ("Marvel was free to reject Kirbys' pages and pay him nothing for it.").

These undisputed facts justify rehearing for one dispositive reason:  they are

incompatible with "work for hire" under fundamental copyright doctrines.  It is

central to our copyright law that copyright "vest[s] in the author of an original

---

[11] Marvel's brinksmanship renders its choice of forum less than ironclad.  "Courts in the Second Circuit have repeatedly refused to exercise jurisdiction over declaratory actions motivated by a desire to wrest the choice of forum from the real plaintiff." *Nat'l Union Fire Ins. Co. v. Int'I Wire Grp. Inc.*, 2003 WL 21277114 at *6 (S.D. N.Y. June 2, 2003); *see also Fuji Photo Film Co. v. Deep Creek Design* 1998 U.S. Dist. Lexis 19525, at *4 (S.D.N.Y. 1998)("[P]laintiffs ... should be encouraged to participate in settlement discussions without the fear that their good faith efforts will allow their adversary to commence litigation in a forum of their own choosing."

work from the time of its creation." *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 547 (1984).  Under the 1909 Act, the author of a "work for hire" is the "employer."  17 U.S.C. § 26 (repealed 1976).  Accordingly, "with a true work for hire, copyright ownership … [is] with the employer automatically upon the employee's creation of the work," and the employer is the "author" at inception.  *Estate of Hogarth v. Edgar Rice Burroughs, Inc.*, 342 F.3d 149, 163 (2d Cir. 2003); Op. 39.  Authorship <u>cannot</u> be based on post-creation events like Marvel's contingent payment for material it liked – authorship is fixed at creation.

The Kirbys emphasized this dispositive point in every one of their briefs but neither court addressed it.  If Marvel was not legally obligated to pay Kirby for conforming services, and did not own Kirby's material until it chose to buy it, how could it have owned such material at inception?  Whether Marvel purchased Kirby's work more often than not (Op. 54) is immaterial to their legal relationship or its legal implications.  Marvel's revisionist "work-for-hire" defense, adopted by the Opinion, leads to contradictions.  It means that Marvel authored those Kirby creations it chose to purchase, and Kirby authored those Marvel rejected.[12]  This stands the "work for hire" doctrine on its head.  Even Marvel has not suggested that

---

[12] The Opinion's broad application of "instance and expense" leads to further contradictions.  *E.g.,* a work created by *a traditional employee* "as a special job assignment, outside … [his] regular duties" is not "work for hire," even though the employer pays for and supervises it.  *Martha Graham School & Dance Foundation, Inc. v. Martha Graham Center of Contemporary Dance, Inc.,* 380 F.3d 624, 635 (2d Cir. 2004).

it authored and owns Kirby material it rejected, and the record suggests it did not.[13]

This is even more problematic as the natural alternative – Marvel's purchase and Kirby's assignment of his material – is *consistently* reflected by the record and leads to no contradictions. *See* Br. 4-5, 13,46-51; Reply 7-10, 20-22. Marvel further admitted that the crux of the "expense" prong is who "b[ears] the entire financial risk associated with the creation of the Works" citing *Twentieth Century Fox Film Corp. v. Enter. Distrib'n*, 429 F.3d 869, 881 (9th Cir. 2005) and *Hogarth,* 2002 U.S. Dist. LEXIS 4219 at *57 (S.D.N.Y. Mar. 15, 2002) (JA(I) 207). The Opinion also acknowledged this. Op. 46. In the cases cited in the Opinion finding "work for hire" based on payment of a "sum certain," including *Twentieth Century* and *Hogarth*, the employer was contractually obligated to pay, regardless of its acceptance for publication.[14] Conversely, where payment was

---

[13] *See* Br. 8, 40-41, 50. In fact, Kirby freely used material he had authored for a Marvel project and sold it to Marvel's competitors. Br. 51.

[14] *See Hogarth*, 342 F.3d at 163 (finding "expense" based on publisher's contractual obligation to pay a guaranteed fixed sum); *Twentieth Century,* 429 F.3d at 881 (finding "expense" based on contractual obligation to pay "nonrefundable" cash advance); *Brattleboro Publ'g Co., v. Winmill Publ'g Corp*., 369 F.2d 565, 568 (2d Cir. 1966) (finding "expense" as employer was obliged to bear expense of work's creation, whether or not accepted, *Brattleboro*, 250 F. Supp. 215, 218 (D. Vt. 1966)); *Playboy Enterpr's, Inc. v. Dumas*, 960 F. Supp. 710, 715-16 (S.D.N.Y. 1997) (publisher's obligation to pay artist a "'turn-down'" fee for "unused work" weighs in favor of "work for hire"; "if Playboy had never published the work at all there would have been no reason to pay anything for it absent a work for hire relationship"), *aff'd Playboy Enterpr's, Inc. v. Dumas* ("*Playboy*"), 53 F.3d 549, 555 (2d Cir. 1995). *See Fifty-Six Hope Rd. Music Ltd.,* 2010 U.S. Dist. LEXIS 94500, at *26-27 (S.D.N.Y. September 10, 2010) ("[employer] paid [artist]

14

*contingent*, this weighed against "work for hire," as the author bore the risk.[15]

Marvel consciously avoided this risk by keeping its options open. Kirby, who invested his own time/expense, assumed the financial risk of *creation*.

The Opinion incorrectly credits Marvel's market risks. Op. 55. This applies to all publishing, and does not distinguish "work for hire."[16] The Opinion also emphasized that Kirby's completed artworks were "not free-standing creative works," that Marvel expended resources publishing finished comics, and that the characters "are now valuable [a]s … a function of Marvel's expenditures over and above" the price paid Kirby. Op.54-55. Respectfully, this is also legally irrelevant.

At issue is *Kirby's* artistic material, not Marvel's comic books. A graphic comic book comprised of illustrations by one author (Kirby) and text by another (Lee) is a classic joint work in which its co-authors own an undivided share. *See Shapiro, Bernstein & Co. v. Jerry Vogel Music Co*., 161 F.2d 406, 409 (2d Cir. 1946). Kirby authored and then assigned his artwork to Marvel. Upon termination of such assignments under 17 U.S.C. §304(c), Kirby's co-author share in the joint work reverts to his children. Lee's employment (or failure to exercise termination

---

advances against royalties for the creation of the [works]" and "recording costs").

[15] *Martha Graham*, 380 F.3d 640 at 641; *Playboy,* 53 F.3d at 555 ("royalty" "weighs against finding a work-for-hire relationship"); *Twentieth Century*, 429 F.3d at 881(same); 1 *Nimmer* § 5.03[B][2][d] at 5-56.8 (same).

[16] *See* 1 M. Nimmer & D. Nimmer, *Nimmer on Copyright* ("*Nimmer*"), § 5.03[B][2] [d] at 5-56.9, n.171c; 2 W. Patry, *Patry on Copyright* ("*Patry*"), § 5:54 (same).

rights) does not render Kirby's co-author contributions "work for hire." [17]

The Opinion's "resources expended" / "value-added" factor applies to every work exploited by a media company. *See Epoch Produc'g Corp. v. Killiam Shows, Inc.,* 522 F.2d 737, 745 (2nd Cir. 1975) ("evidence that is [equally] consistent with" non-work for hire "cannot be bootstrapped."). "[I]f funding publication could convert a manuscript into a work for hire, then the category would soon subsume all published material...". *Nimmer*, § 5.03[B][2][d] at 5-56.9, n.171c.

The Opinion's reliance on Marvel's ownership of underlying rights (Op. 54) is likewise wrong under well-settled law. *See Stewart v. Abend*, 495 U.S. 207, 223 (1990) (under the 1909 Act, "[t]he aspects of a derivative work added by the derivative author are that author's property"); *Siegel,* 496 F. Supp. 2d at 1142 ("Were the Court to adopt defendants' approach every derivative work would also be [] a work made for hire."). Moreover, as to the characters at issue, Kirby himself co-authored *the original work*, which is subject to termination.

It is also well settled that whether a work is "made for hire" under the 1909 Act is a factual issue which turns on the objective "intent of the parties" when the works were created. *Martha Graham,* 380 F.3d at 634 n.17; *Twentieth Century,* 429 F.3d at 877 (same); *Playboy,* 53 F.3d at 556-57 (same); 1 *Nimmer* §

---

[17] *Siegel v. Time Warner Inc.*, 496 F. Supp. 2d 1111, 1144 (C.D. Cal. 2007)(As to [Siegel/Shuster's] joint work, [DC] would own half of the copyright []as the author of Shuster's alleged work for hire or... given his [] failure to...terminat[e]...").

5.03[B][2][c] at 5-56.1("work for hire" under the 1909 Act "always turn[s] on the intention of the parties."). Satisfaction of the "instance and expense" test itself only raises a presumption as to the "mutual intent of the parties." *Id*.

Courts should not retroactively impute an intent the parties could not have had. Until 1965-66, "the courts had applied the work for hire doctrine under the 1909 Act exclusively to traditional employees." *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 749 (1989) ("*CCNV*"). Even if Kirby had retained sophisticated counsel, he would have been told in 1958-63 that his freelance work was <u>not</u> "work for hire." JA(VIII) 2043-46, n.80 (M. Nimmer, *Nimmer on Copyright* (1963)).

All the record evidence thus pointed to the fact that Kirby assigned the freelance material Marvel chose to purchase. Their sole contemporaneous agreements consisted of assignments on the back of Marvel's checks. Op. 56.[18] Kirby's express contemporaneous assignments of copyright ownership directly conflicts with Marvel's revisionist "work for hire" claim. The evidence further revealed that when Marvel later intended work to be "for hire" its check legend agreements contained explicit "work for hire" language.[19]

---

[18] *See* Br. 31, 47-48; Reply 25, 21-22. The earliest check Marvel produced with a legend mentioning "work for hire" was from 1986. JA(VII) 1818-1819.

[19] *Compare* JA(VII) 1883 ("By endorsement … payee, acknowledges full payment …for my assignment to [Marvel] of any copyright … including my assignment of …renewal copyright.") *with* JA(VII) 1818-19("[By] endorsement…payee acknowledges...all payee's works are…works for hire, the property of [Marvel]").

Numerous contemporaneous freelancers, including Marvel's own witnesses, all testified that Marvel just "purchased" that material it sought to publish.  *See* Br. 6-7, 34, 49-50; Reply 3, 8-10.[20]  *See Dolman v. Agee*, 157 F.3d 708, 712 (9th Cir. 1998). (written assignment rebuts "work for hire" presumption); *Shapiro,* 221 F.2d at 570*,* (no "work for hire" as employer *purchased* song).[21]

The Opinion incorrectly holds that the Kirbys presented no rebuttal evidence of a contrary agreement sufficient to reach the trier of fact; dismissing the Kirby-Marvel "assignment agreements" on the back of Marvel's checks with speculation and unsupported inferences against the non-movant.  Op. 56 ("It is all too likely that…Kirby's assignments at the time he was paid…were redundancies insisted upon by Marvel to protect its rights.").[22]

Notably, the cases relied upon by the panel were all tried.[23]  The record evidence, at a minimum, was more than sufficient to raise a triable issue of fact.

-----------------------

[20] That Marvel did not view freelance material as "work for hire" is also shown by Marvel's concern over its failure to pay sales tax when it *purchased* it.  Br. 50-51.

[21] Purchase and assignment (not "work for hire") language even pervades Marvel's 1975 contract with Kirby and its other freelance contracts in the 1970's.  Br. 47-49.

[22] As Marvel drafted these contractual legends, any ambiguity must be construed against it. *See McCarthy v. Am. Int'l Group*, 283 F.3d 121, 124 (2d Cir. 2002).

[23] *See Hogarth,* 342 F.3d at150; *Playboy*, 53 F.3d at 551; *Martha Graham*, 380 F.3d at 631. *See Simon*, 310 F.3d at 292 (*Captain America*: "[I]t will be for the [trier of fact] to determine whether Simon was the author…and, therefore, whether he can exercise § 304(c)'s termination right."); *Gary Friedrich Enterpr's, LLC v. Marvel Char'ters, Inc*., 716 F.3d 302, 320-321 (2d Cir. N.Y. 2013) (*Ghostrider*: issues of fact "preclude granting summary judgment on the issue of authorship.").

## A.    The "Instance And Expense" Test Should Be Narrowly Construed

As noted (Op. 43, n.8), this Circuit's application of "work for hire" to freelancers under the 1909 Act has been roundly "criticized,"[24] and "called into question" by the Supreme Court in *CCNV*, 490 U.S. at 744.  In reviewing this Circuit's vague caselaw under the 1909 Act,[25] the Supreme Court distinguished between an "independent contractor" and "employee," by expressly stating that "when Congress has used the term 'employee' without defining it, we have concluded that Congress intended to describe the conventional master-servant relationship as understood by common-law agency doctrine."  *Id.* at 739-40.  On this basis, the Supreme Court unanimously *rejected* this Circuit's application of the "instance and expense" test to the 1976 Act, as the "paramount goal" is to "enhance predictability and certainty of copyright ownership." *Id*. at 749-50[26]; *see* 1 *Nimmer* § 5.03[B][1][a][ii].  Authorities read *CCNV* as overruling the "instance and expense" test under the 1909 Act.  *See* 3 *Nimmer* § 9.03[D] at 9-32 to 9-34.

---

[24] *See* 3 *Nimmer* § 9.03[D], at 9-28.2 to 9-28.3 (such decisions are "wrong both on principle and under the rule of the early cases"); 2 *Patry* § 5:44 (criticizing "the worst features of [the] presumptive 'instance and expense' approach.").

[25] The 1909 Copyright Act states only that "[t]he word author shall include an employer in the case of works made for hire." 17 U.S.C. § 26 (repealed).

[26] Relevant "law of agency" factors favor the Kirbys, including "skill required; [] source of …tools; [] location …; discretion over when and how long to work; the method of payment; … employee benefits[,] tax treatment," etc.  *Id.* at 751-52.

Until this case, this Circuit has never applied the ephemeral "instance and expense" test to negate termination rights. When it did address termination and "work for hire" under the 1909 Act in *Marvel v. Simon*, it did so narrowly, refusing to summarily apply the "instance and expense" test.  310 F.3d at 290-292.

In recognition of Congress' intent to "enhance the author's position" by adjusting "the author/publisher [im]balance," the Supreme Court has repeatedly endorsed the "inalienable authorial right to revoke a copyright transfer."  *N.Y. Times,* 533 U.S. at 496 n.1; *Stewart v. Abend*, 495 U.S. 207, 219, 230 (1990)*; Simon,* 310 F.3d at 290.  If the already vague "instance and expense" test is loosely applied as it was here, the so-called "work for hire" exception will swallow the rule and effectively gut the termination rights of numerous authors to a vast number of works.  *See* 17 U.S.C. §§ 304(c), (d) (applies solely to pre-1978 works).

The prolific Kirby, who redefined an industry from a small drafting board in his basement is a poster-child for the termination right – his situation exemplifies the very imbalance Congress sought to rectify.  Given the concerted legislative objective to benefit authors, use of the controversial "instance and expense" test to strip freelancers like Kirby of their statutory termination right, should be reconsidered, and applied narrowly, if not abolished under *CCNV*.

## CONCLUSION

For the foregoing reason, the Court should grant rehearing or rehearing en banc.

Dated: September 9, 2012       /s/ Marc Toberoff
Malibu, California             Marc Toberoff (MT 4862)

TOBEROFF & ASSOCIATES, P.C.

Attorneys for Defendants-Appellants,
Lisa R. Kirby, Neal L. Kirby, Barbara J.
Kirby,  and Susan M. Kirby

# <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rule of Appellate Procedure 40(b) and 32(a) and to the Court's September 4, 2013 Order granting Appellants' Motion To File Oversized Brief In Support of Petition For Rehearing Or Rehearing En Banc, not to exceed 20 pages (Dkt. No. 158),  I certify that Appellants' attached Petition for Rehearing or Rehearing En Banc is proportionately spaced, has a typeface of 14 points or more, and does not exceed 20 pages, excluding the parts of the motion exempted by Rule 32(a)(7)(B)(iii).

Dated: September 9, 2013            /s/ Marc Toberoff
Malibu, California                  Marc Toberoff (MT 4862)

TOBEROFF & ASSOCIATES, P.C.
22237 Pacific Coast Highway #348
Malibu, California 90265
Telephone:   (310) 246-3333
Facsimile:   (310) 246-3101
*mtoberoff@ipwla.com*

Attorneys for Defendants-Appellants,
Lisa R. Kirby, Barbara J. Kirby, Neal L.
Kirby and Susan M. Kirby

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing was served electronically by the Court's ECF system and by first class mail on those parties not registered for ECF pursuant to the rules of this court.  Pursuant to Local Rule 35.1, fifteen paper copies of the petition have been or will be mailed via first-class mail to the Court.

Dated: September 9, 2013
Malibu, California

/s/ Marc Toberoff
Marc Toberoff (MT 4862)

TOBEROFF & ASSOCIATES, P.C.
22237 Pacific Coast Highway #348
Malibu, California 90265
Telephone:   (310) 246-3333
Facsimile:   (310) 246-3101
*mtoberoff@ipwla.com*

Attorneys for Defendants-Appellants,
Lisa R. Kirby, Barbara J. Kirby, Neal L.
Kirby and Susan M. Kirby

# Exhibit 1

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: August 8, 2013

11-3333-cv
Marvel Characters, Inc. v. Kirby

USDC - SDNY
1:10-cv-00141-CM-KNF

1        UNITED STATES COURT OF APPEALS

2            FOR THE SECOND CIRCUIT

3               August Term, 2012

4   (Argued: October 24, 2012    Decided: August 8, 2013)

5              Docket No. 11-3333-cv

6       --------------------------------------

7   MARVEL CHARACTERS, INCORPORATED, MARVEL WORLDWIDE,
8           INCORPORATED, MVL RIGHTS, LLC,

9       Plaintiffs-Counter-Defendants-Appellees,

10  WALT DISNEY COMPANY, MARVEL ENTERTAINMENT, INCORPORATED,

11          Counter-Defendants-Appellees,

12                  - v -

13  LISA R. KIRBY, NEAL L. KIRBY, SUSAN N. KIRBY, BARBARA J.
14                  KIRBY,

15      Defendants-Counter-Claimants-Appellants.

16      --------------------------------------

17  Before: CABRANES, SACK, and CARNEY, Circuit Judges.

18          Appeal by the defendants-counter-claimants from a

19  judgment of the United States District Court for the

20  Southern District of New York (Colleen McMahon, Judge)

21  granting summary judgment in favor of the plaintiffs-

22  counter-defendants on their claim for declaratory relief and

23  denying the defendants-counter-claimants' cross-motion for

24  summary judgment.  Plaintiffs-counter-defendants commenced

1    this lawsuit in response to notices sent by the defendants-

2    counter-claimants, the children of comic book artist Jack

3    Kirby, purporting to terminate alleged assignments in

4    certain of their father's works pursuant to

5    section 304(c)(2) of the Copyright Act of 1976.  We conclude

6    that: (1) the district court incorrectly determined that it

7    had personal jurisdiction over Lisa and Neal Kirby; (2) Lisa

8    and Neal Kirby were not indispensable parties to the action

9    under Rule 19(b) of the Federal Rules of Civil Procedure;

10   and (3) the district court correctly determined that the

11   works at issue were "made for hire" under section 304(c),

12   and that Marvel was therefore entitled to summary judgment.

13            Affirmed in part; vacated in part.

14                          R. BRUCE RICH (James W. Quinn, Randi
15                          W. Singer, Gregory Silbert, on the
16                          brief), Weil, Gotshal & Manges LLP,
17                          New York, New York; David Fleischer,
18                          Haynes and Boone, LLP, New York, New
19                          York for Plaintiffs-Counter-
20                          Defendants-Appellees and Counter-
21                          Defendants-Appellees.

22                          MARC TOBEROFF, Toberoff &
23                          Associates, P.C., Malibu,
24                          California, for Defendants-Counter-
25                          Claimants-Appellants.

26   SACK, Circuit Judge:

27            This appeal requires us to revisit our case law

28   applying the work-for-hire doctrine in the context of

29   section 304 of the Copyright Act of 1976 (or, the "1976

2

1  Act"), 17 U.S.C. § 304.  Defendants-counter-claimants-
2  appellants Lisa, Neal, Susan, and Barbara Kirby
3  (collectively, the "Kirbys") are the children of the late
4  Jack Kirby.  Kirby is considered one of the most influential
5  comic book artists of all time.  At various times throughout
6  his career, he produced drawings for Marvel Comics, a comic
7  book publisher that has since grown into the multifaceted
8  enterprise reflected in the case caption:  Marvel
9  Characters, Inc., Marvel Worldwide, Inc., MVL Rights, LLC,
10  and Marvel Entertainment, Inc. (collectively, "Marvel").  At
11  issue here are the rights to drawings Kirby allegedly
12  created between 1958 and 1963.

13      The Kirbys appeal from the district court's grant
14  of summary judgment to Marvel, which was based on the
15  conclusion that all of the works at issue are "works made
16  for hire" within the meaning of section 304(c), and that the
17  Kirbys therefore have no rights to the works.  Two of the
18  Kirbys, Lisa and Neal, also challenge the district court's
19  conclusion that it had personal jurisdiction over them under
20  New York's long-arm statute.  They further argue that they
21  are indispensable parties under Rule 19(b) of the Federal
22  Rules of Civil Procedure, such that their absence from this
23  lawsuit (by virtue of the district court's lack of personal

1    jurisdiction over them) requires that the suit be dismissed

2    in its entirety.

3         We conclude that the district court was without

4    personal jurisdiction over Lisa and Neal.  We therefore

5    vacate the judgment as against them.  We also find, however,

6    that Lisa and Neal are not indispensable parties to this

7    lawsuit, and that the district court was correct in

8    concluding that the works at issue are "works made for hire"

9    under section 304(c).  We therefore affirm the judgment as

10   to defendants Barbara and Susan.

11                           **BACKGROUND**

12        In this appeal from the grant of summary judgment,

13   we view the evidence in the light most favorable to the

14   nonmovants, the Kirbys for present purposes, and draw all

15   reasonable inferences in their favor.  <u>See, e.g.</u>, <u>Singer v.</u>

16   <u>Ferro</u>, 711 F.3d 334, 339 (2d Cir. 2013).

17        <u>Jack Kirby</u>

18        Jack Kirby, born Jacob Kurtzberg in New York

19   City's Lower East Side in 1917, began his career in the

20   comic book business in the late 1930s.  In the summer of

21   1940, a young woman named Rosalind moved into the apartment

22   above his with her family.  The day they met, Kirby asked

23   Rosalind if she "[w]ould like to see [his] etchings[.]"  She

24   thought he wanted "to fool around"; he only wanted to show

                                4

1    her his drawings for a new comic book series called <u>Captain</u>
2    <u>America</u>.  John Morrow, <u>"Would You Like to See My Etchings?":</u>
3    <u>Rosalind Kirby Interviewed</u> (conducted Dec. 12, 1995), THE
4    JACK KIRBY COLLECTOR, April 1996, at 6.  Kirby and "Roz" were
5    married in 1942.  After Kirby's military service in World
6    War II, the couple had four children: Susan, Neal, Barbara,
7    and Lisa.

8         Kirby's career in comic book illustration spanned
9    more than half a century.  His influence was substantial.
10   An obituary marking his death in 1994 quoted Joe Simon,
11   Kirby's creative partner for fifteen years: "He brought the
12   action drawing to a new level.  His style was imitated all
13   over and still is today to a certain extent."  <u>Jack Kirby,</u>
14   <u>76; Created Comic Book Superheroes</u>, N.Y. TIMES, Feb. 8, 1994,
15   at D22.

16        Kirby was prolific, too.  In 1951 alone, 308 pages
17   of Kirby's work appeared in published comic books.  This
18   output was typical for him in the years between 1940 and
19   1978.

20             <u>Marvel Comics and Stan Lee</u>

21        Marvel was founded as Timely Comics in 1939 by one
22   Martin Goodman.  In 1940, Marvel purchased the first ten
23   issues of <u>Captain America</u> from Kirby and Joe Simon.  But

```
 1    Kirby and Simon would soon move on to a competitor, DC

 2    Comics.  To replace them, Goodman hired one Stanley Lieber.

 3          Lieber would come to be known by his pen name,

 4    Stan Lee.  Lee is in his own right a towering figure in the

 5    comic book world, and a central one in this case.  He in

 6    effect directed Marvel from the early 1940s until sometime

 7    in the 1970s, serving, in his words, as "Editor," "Art

 8    Director" and "a staff writer."  Deposition of Stan Lee

 9    ("Lee Dep."), May 13, 2010, at 17, Joint App'x at 2437.  He

10    continued to work for Marvel in one capacity or another at

11    least to the day of his deposition testimony in this

12    litigation.

13          But in the 1940s and 50s, Marvel, hobbled by poor

14    business decisions, was hardly a success story.[1]  In 1958,

15    Kirby began producing drawings for Marvel once again.  And

16    by 1961, its fortunes began to change.  That year, Marvel

17    released the first issues of The Fantastic Four.  On its

18    heels were releases of the first issues of some of Marvel's
```

---

[1] Certainly not helping matters was a mid-1950s investigation by the United States Senate into comics' alleged corrupting influence on America's youth.  On April 21, 1954, a subcommittee of the Senate Judiciary Committee held a televised hearing on the topic.  Louis Menand, The Horror: Congress investigates the comics, THE NEW YORKER, Mar. 31, 2008, at 124. The venue was the United States Courthouse at 40 Foley Square in New York City -- named in 2001 the "Thurgood Marshall United States Courthouse" -- in which this opinion was prepared.  Id.

```
1    most enduring and profitable titles, including The

2    Incredible Hulk, The X-Men, and Spider-Man.

3                 Kirby's Relationship with Marvel from 1958-1963

4           This litigation concerns the property rights in

5    262 works published by Marvel between 1958 and 1963.  Who

6    owns these rights depends upon the nature of Kirby's

7    arrangement with Marvel during that period.

8           It is undisputed that Kirby was a freelancer,

9    i.e., he was not a formal employee of Marvel, and not paid a

10   fixed wage or salary.  He did not receive benefits, and was

11   not reimbursed for expenses or overhead in creating his

12   drawings.  He set his own hours and worked from his home.

13   Marvel, usually in the person of Stan Lee, was free to

14   reject Kirby's drawings or ask him to redraft them.  When

15   Marvel accepted drawings, it would pay Kirby by check at a

16   per-page rate.

17          Despite the absence of a formal employment

18   agreement, however, the record suggests that Kirby and

19   Marvel were closely affiliated during the relevant time

20   period.  Lee assigned Kirby, whom he considered his best

21   artist, a steady stream of work during that period.  See Lee

22   Dep. at 36, Joint App'x at 2456 ("I wanted to use Jack for

23   everything, but I couldn't because he was just one guy.");
```

1    <u>id.</u> at 37, Joint App'x at 2457 ("So I said:  All right,

2    forget it, Jack.  I will give [the Spider-Man strip] to

3    somebody else.  Jack didn't care.  He had so much to do.");

4    <u>id.</u> at 30, Joint App'x 2450 ("He got the highest [rate]

5    because I considered him our best artist.").

6          And Kirby seems to have done most of his work with

7    Marvel projects in mind.  Although the Kirby children assert

8    that their father could and did produce and sell his work to

9    other publishers during those years, lists of Kirby's works

10   cited by both parties establish that the vast majority of

11   his published work in that time frame was published by

12   Marvel (or Atlas Comics, as part of Marvel Comics Group).

13         The specifics of Kirby and Marvel's creative

14   relationship during this time period are less clear.

15         According to Lee, at the relevant time, artists

16   worked using what the parties call the "Marvel Method."  It

17   was developed as a way to "keep a lot of artists busy" when

18   Lee or another writer could not provide the artist with a

19   completed script.  Lee Dep. at 21, Joint App'x at 2441.  The

20   first step was for Lee to meet with an artist at a "plotting

21   conference."  <u>Id.</u> at 39-40, Joint App'x at 2459-60.  Lee

22   would provide the artist with a "brief outline" or

23   "synopsis" of an issue; sometimes he would "just talk . . .

1    with the artist" about ideas.  Id. at 35, Joint App'x at

2    2455.  The artist would then "draw it any way they wanted

3    to."  Id. at 21, Joint App'x at 2441.  Then a writer, such

4    as Lee, would "put in all the dialogue and the captions."

5    Id.  According to Lee, he "maintain[ed] the ability to edit

6    and make changes or reject what the other writers or artists

7    had created."  Id. at 22, Joint App'x at 2442.

8            Lee testified that he worked this way with Kirby

9    "for years":

10               And Jack Kirby and I would, let's say
11               when we did the Fantastic Four, I first
12               wrote a synopsis of what I thought the
13               Fantastic Four should be, who the
14               characters should be, what their
15               personalities were.  And I gave it to
16               Jack, and then I told him what I thought
17               the first story should be, how to open
18               it, who the villain should be, and how we
19               would end it.  And that was all.  Jack
20               went home and drew the whole thing.  I
21               put the dialogue in.

22    Id. at 118, Joint App'x at 2538.

23            Other evidence in the record, including some of

24    Lee's own deposition testimony, indicates, however, that

25    Kirby had a freer hand within this framework than did

26    comparable artists.  For example, Lee explained that

27    "instead of telling [Kirby] page by page" what to draw, Lee

28    might simply tell him to "[d]evote five pages to this, five

29    pages to that, and three pages to that."  Id. at 70, Joint

9

1    App'x at 2490.  Sometimes during plotting sessions, Kirby

2    might "contribute something or he might say, 'Stan, let's

3    also do this or do that.'"  Id. at 41, Joint App'x at 2461.

4         It is beyond dispute, moreover, that Kirby made

5    many of the creative contributions, often thinking up and

6    drawing characters on his own, influencing plotting, or

7    pitching fresh ideas.

8              The Termination Notices

9         The dispute before us began in September 2009,

10   when the Kirbys served various Marvel entities with

11   documents entitled "Notice of Termination of Transfer

12   Covering Extended Renewal Term" (the "Termination Notices").

13   The Termination Notices purport to exercise statutory

14   termination rights under section 304(c)(2) of the Copyright

15   Act of 1976, 17 U.S.C. § 304, with respect to 262 works in

16   all.

17        Each notice states an effective date sometime in

18   the future, presumably between 2014 and 2019.  The effective

19   dates are calculated according to section 304(c)'s timing

20   provision, which states in relevant part that

21   "[t]ermination . . . may be effected at any time during a

22   period of five years beginning at the end of fifty-six years

10

1    from the date copyright was originally secured . . . ."  17

2    U.S.C. § 304(c)(3).

3              Procedural History

4              Marvel filed this lawsuit on January 8, 2010.  It

5    sought a declaration that the Kirbys have no termination

6    rights under section 304(c)(2), and that the Termination

7    Notices are therefore ineffective.  Marvel's claim was

8    premised on its contention that all of the works were "made

9    for hire" by Jack Kirby for Marvel within the definition of

10   section 304(c).

11             On March 9, 2010, the Kirbys filed a motion to

12   dismiss the complaint.  Lisa and Neal Kirby, residents of

13   California, sought dismissal on the ground that they were

14   not subject to personal jurisdiction in New York State.

15   (The other Kirby siblings, Susan and Barbara, are residents

16   of New York and do not contest personal jurisdiction.)  The

17   Kirbys also argued that Lisa and Neal are indispensable to

18   the action under Fed. R. Civ. P. 19, and that Marvel's

19   entire suit must therefore be dismissed as against all

20   parties.

21             The district court denied the motion on April 14,

22   2010.  Marvel Worldwide, Inc. v. Kirby, No. 10 Civ. 141,

23   2010 WL 1655253, 2010 U.S. Dist. LEXIS 38701 (S.D.N.Y. Apr.

14, 2010).  It concluded that it had personal jurisdiction
over Lisa and Neal under New York's long-arm statute, and
that the exercise of this jurisdiction was consistent with
constitutional due process.  Id. at *3-*9; 2010 U.S. Dist.
LEXIS 38701, at *7-*25.  It therefore did not reach the
question of whether Lisa and Neal were indispensable
parties.

        The Kirbys answered Marvel's complaint and
asserted several counterclaims of their own.  Marvel moved
to dismiss each of them.  On November 22, 2010, the district
court granted the motion as to all but the Kirbys'
counterclaim seeking a declaration that the Termination
Notices were valid.  Marvel Worldwide, Inc. v. Kirby, 756
F. Supp. 2d 461 (S.D.N.Y. 2010).

        In early 2011, after discovery was complete, the
parties cross-moved for summary judgment.  Marvel also moved
to exclude some of the Kirbys' evidence, most notably the
reports of the Kirbys' putative expert witnesses, John
Morrow and Mark Evanier.

        On July 28, 2011, the district court granted
Marvel's motions to exclude Morrow and Evanier's testimony,
and granted Marvel's motion for summary judgment.  Marvel
Worldwide, Inc. v. Kirby, 777 F. Supp. 2d 720 (S.D.N.Y.

                            12

1    2011).  It relied upon case law in this Circuit applying the

2    so-called "instance and expense test" to determine whether a

3    work is "made for hire" under section 304(c).  Id. at 738-

4    43.  The court concluded that undisputed facts in the record

5    establish as a matter of law that the works at issue were

6    made at Marvel's instance and expense, and were therefore

7    works made for hire.  Id.  This being so, the Kirbys had no

8    termination rights, and their Termination Notices were

9    ineffective.  The district court entered judgment

10   accordingly on August 8, 2011.

11        The Kirbys appeal.

12                        **DISCUSSION**

13        **I.  Personal Jurisdiction over Lisa and Neal Kirby**

14        We turn first to the issue of personal

15   jurisdiction over Lisa and Neal Kirby.  Lisa and Neal are

16   California residents.  They contend that the district court

17   erred when it determined that New York State's long-arm

18   statute provided a basis for jurisdiction over them in the

19   Southern District of New York.  We review a district court's

20   legal conclusions concerning its exercise of personal

21   jurisdiction de novo, and its underlying factual findings

22   for clear error.  D.H. Blair & Co., Inc. v. Gottdiener, 462

23   F.3d 95, 103 (2d Cir. 2006).

1    A district court must have a statutory basis for

2    exercising personal jurisdiction.  See Grand River

3    Enterprises Six Nations, Ltd. v. Pryor, 425 F.3d 158, 165

4    (2d Cir. 2005).  Because this is "a federal question case

5    where a defendant resides outside the forum

6    state, . . . [and the relevant] federal statute does not

7    specifically provide for national service of process," PDK

8    Labs, Inc. v. Friedlander, 103 F.3d 1105, 1108 (2d Cir.

9    1997) (internal quotation marks omitted), we apply "the

10   forum state's personal jurisdiction rules," id.  We

11   therefore look to New York State law.

12       We focus our attention on section 302(a)(1) of New

13   York State's long-arm statute, N.Y. C.P.L.R. § 302(a)(1),

14   upon which the district court rested its jurisdiction, and

15   which Marvel invokes here.  Section 302(a)(1) provides that

16   "a court may exercise personal jurisdiction over any non-

17   domiciliary . . . who in person or through an agent  . . .

18   transacts any business within the state . . . ."  Id.  We

19   have recognized that for section 302(a)(1) to apply, "'it is

20   essential . . . that there be some act by which the

21   defendant purposefully avails [herself] of the privilege of

22   conducting activities within the forum State, thus invoking

23   the benefits and protections of its laws.'"  Beacon

14

1    <u>Enterprises, Inc. v. Menzies</u>, 715 F.2d 757, 766 (2d Cir.

2    1983) (alteration in original) (quoting <u>George Reiner and</u>

3    <u>Co. v. Schwartz</u>, 41 N.Y.2d 648, 650, 363 N.E.2d 551, 553,

4    394 N.Y.S.2d 844, 846 (1977)).

5         Under the facts of this case, the only acts that

6    could potentially give rise to section 302(a)(1)

7    jurisdiction over Lisa and Neal are the sending of the

8    Termination Notices to Marvel in New York.  We conclude that

9    this is an insufficient basis for personal jurisdiction.

10        In <u>Beacon Enterprises</u>, <u>supra</u>, we applied section

11   302(a)(1) in a declaratory judgment suit very similar to

12   this one.  The defendant there, Mary Menzies, thought that

13   the plaintiff, Beacon, was infringing her trademarks and

14   copyrights in a line of weight-loss garments designed to

15   emulate the effects of a sauna.  <u>Beacon Enterprises</u>, 715

16   F.2d at 760.  Menzies sent a cease-and-desist letter to

17   Beacon at its New York City headquarters, threatening

18   litigation.  <u>Id.</u>  Upon receiving it, Beacon filed a suit in

19   the United States District Court for the Southern District

20   of New York, seeking a judgment declaring that its products

21   did not infringe Menzies' intellectual property rights.  <u>Id.</u>

22        We concluded that Menzies' mailing of the cease-

23   and-desist letter into New York was insufficient to give

15

1   rise to personal jurisdiction over her under section
2   302(a)(1).  _Id._ at 762, 766.  We pointed out that "New York
3   courts have consistently refused to sustain section
4   302(a)(1) jurisdiction solely on the basis of defendant's
5   communication from another locale with a party in New York."
6   _Id._ at 766 (collecting cases).  And we thought it "difficult
7   to characterize Menzies' letter alleging infringement in an
8   unspecified locale and threatening litigation in an
9   unspecified forum as an activity invoking the 'benefits and
10  protections' of New York law."  _Id._

11       In _Ehrenfeld v. Bin Mahfouz_, 9 N.Y.3d 501, 881
12  N.E.2d 830, 851 N.Y.S.2d 381 (2007), the New York Court of
13  Appeals, responding to a certified question from us,
14  confronted a somewhat analogous fact pattern.  There, the
15  defendant had obtained a default judgment against the
16  plaintiff in English courts for the plaintiff's allegedly
17  libelous statements.  _Id._ at 505, 881 N.E.2d at 832, 851
18  N.Y.S.2d at 383.  The plaintiff brought suit in federal
19  court in the Southern District of New York seeking a
20  declaration that she could not be held liable for defamation
21  under the circumstances of that case, and that the
22  defendant's default judgment was therefore not enforceable
23  against her in New York.  She argued that the "defendant

1    ha[d] transacted business in New York because he

2    purposefully projected himself into the state to further a

3    'foreign litigation scheme'" -- the libel suit in England --

4    "designed to chill her speech." Id. at 508, 881 N.E.2d at

5    834, 851 N.Y.S.2d at 385.

6          When the case came before us on appeal, we

7    certified to the New York Court of Appeals the question

8    whether section 302(a)(1) conferred jurisdiction in the

9    circumstances presented. Id. at 504, 881 N.E.2d at 831, 851

10   N.Y.S.2d at 382; see Ehrenfeld v. Bin Mahfouz, 489 F.3d 542,

11   551 (2d Cir. 2007). The Court of Appeals answered in the

12   negative, reasoning:

13              Here, none of defendant's relevant New
14              York contacts have invoked the privileges
15              or protections of our State's laws.
16              Quite to the contrary, his communications
17              in this state were intended to further
18              his assertion of rights under the laws of
19              England. As defendant points out -- and
20              plaintiff does not dispute -- his
21              prefiling demand letter and his service
22              of documents were required under English
23              procedural rules governing the
24              prosecution of defamation actions. And
25              in none of his letters to plaintiff did
26              defendant seek to consummate a New York
27              transaction or to invoke our State's
28              laws.

29   Ehrenfeld, 9 N.Y.3d at 509, 881 N.E.2d at 835, 851 N.Y.S.2d

30   at 386.

1    Beacon Enterprises and Ehrenfeld point to the
2    result of the jurisdictional inquiry here.

3    Like the defendants in those cases, Lisa and Neal
4    were not "present" in New York -- whether physically or
5    through some other continuous contact[2] -- in connection with
6    the underlying dispute in this case.  This factor is not
7    alone dispositive, of course.  Cf. Deutsche Bank Sec., Inc.
8    v. Montana Bd. of Invs., 7 N.Y.3d 65, 71, 850 N.E.2d 1140,
9    1142, 818 N.Y.S.2d 164, 166-67 (2006) ("[P]roof of one
10   transaction in New York is sufficient to invoke
11   jurisdiction, even though the defendant never enters New
12   York." (internal quotation marks omitted)).  It does,
13   however, set this action apart from those the New York Court
14   of Appeals has described as "the clearest sort of case[s] in
15   which [New York] courts would have 302 jurisdiction," George
16   Reiner & Co., Inc. v. Schwartz, 41 N.Y.2d 648, 652 (1977), a
17   notion plainly grounded in constitutional principles of due

---

[2]  The New York Court of Appeals has recognized that an
individual, although not physically present in the state, may
still be present in the relevant sense through some "direct and
personal involvement" in "sustained and substantial transaction
of business."  Parke-Bernet Galleries v. Franklyn, 26 N.Y.2d 13,
18, 256 N.E.2d 506, 508, 308 N.Y.S.2d 337, 340 (1970).
Participation in an auction by phone is one example.  Id.  Marvel
does not allege such a connection in this case, and we do not
perceive one in the record.

1    process developed by the federal courts in and since

2    <u>International Shoe Co. v. Washington</u>, 326 U.S. 310 (1945).

3              Neither were Lisa and Neal's communications part,

4    or in contemplation, of a course of business dealings with

5    Marvel.  This distinguishes them from the sort of

6    communications we found sufficient to confer section

7    302(a)(1) jurisdiction in <u>PDK Labs</u>, a case relied upon by

8    the district court, but distinguished in <u>Ehrenfeld</u>, 9 N.Y.3d

9    at 510, 881 N.E.2d at 836, 851 N.Y.S.2d at 387.  In <u>PDK</u>

10   <u>Labs</u>, we concluded that the defendant had "purposefully

11   availed himself of the New York forum by using [his agent]

12   in New York and apparently elsewhere for many years to

13   advance his interest in his unique 'product' through

14   soliciting funds and negotiating royalty agreements."  <u>PDK</u>

15   <u>Labs</u>, 103 F.3d at 1111; <u>see also</u> <u>Hoffritz for Cutlery, Inc.</u>

16   <u>v. Amajac, Ltd.</u>, 763 F.2d 55, 57 (2d Cir. 1985) (concluding

17   that contract negotiated in part in New York, signed in

18   Georgia and New York, and containing a New York forum

19   selection clause constituted "transaction of business" in

20   New York under section 302(a)(1)).  Here, by contrast, the

21   Termination Notices bear no indication that the Kirbys were

22   negotiating or cared to negotiate for or solicit Marvel's

23   business.

19

```
 1            Finally, and perhaps most importantly, the
 2   Termination Notices, like the letter in Beacon Enterprises
 3   and the communications in Ehrenfeld, asserted legal rights
 4   under a body of law other than New York's.  What the Kirby
 5   siblings seek to vindicate are purported termination rights
 6   under section 304(c) of the federal copyright laws; they
 7   seek no privilege or benefit conferred by New York State
 8   law.  Section 304(c)(4), moreover, states that termination
 9   rights "shall be effected by serving an advance notice in
10   writing upon the grantee [of the initial assignment] or the
11   grantee's successor in title."  The Termination Notices thus
12   not only seek to vindicate rights under federal law, they
13   also are a compulsory feature of that body of law.
14            We think these factors foreclose the exercise of
15   section 302(a)(1) jurisdiction in the circumstances of this
16   case.  We conclude that a communication from out-of-state,
17   required for the exercise of rights conferred under a
18   federal statute, cannot alone constitute a purposeful
19   availment of "the benefits and protections of [New York's]
20   laws," at least where the only connection to New York is
21   that the recipient's business headquarters has a New York
22   address.
```

20

1    Marvel's principal argument to the contrary rests
2    on the premise that the Termination Notices are self-
3    executing, legally effective communications.  They are
4    therefore different from the cease-and-desist letter at
5    issue in <u>Beacon Enterprises</u>, Marvel contends, because there
6    the notice did no more than advise the recipient of alleged
7    infringement and threaten future litigation.

8    To begin with, we doubt Marvel's is an entirely
9    accurate characterization of the Termination Notices:  They
10   are necessary to the exercise of the termination rights, but
11   only the additional act of filing the notices with the
12   Copyright Office consummates the legal act of termination.
13   <u>See</u> 17 U.S.C. § 304(c)(4)(A).  In any event, Marvel does not
14   explain why the notices' legal effect under federal
15   copyright law renders the act of mailing them any more a
16   "transaction of business" or a purposeful invocation of the
17   benefits and protections of New York law than would be other
18   communications.

19   Marvel also points to the notices' effects on
20   Marvel in New York, characterizing them as "target[ing] the
21   center of gravity of Marvel's publishing business," and of
22   having been "designed to disrupt and divert license fees
23   from Marvel's New York-based business," leaving Marvel with

"no option but to protect its rights and those of its
licensees."  Appellees' Br. at 47-48 & n.17.  These
statements may well be essentially true, if perhaps a bit
hyperbolic.  But the Court in Ehrenfeld rejected virtually
identical arguments based on the alleged in-state effects of
the English default judgment that the defendant had obtained
in the defamation case against the plaintiff, and the in-
state action that that judgment would compel.  See
Ehrenfeld, 9 N.Y.3d at 511, 881 N.E.2d 830, 837, 851
N.Y.S.2d 381, 388.  Cf. Whitaker v. Am. Telecasting, Inc.,
261 F.3d 196, 209 (2d Cir. 2001) (finding that "financial
consequences in New York due to the fortuitous location of
plaintiffs" are insufficient to confer jurisdiction under
section 302(a)(3)).  We read Ehrenfeld strongly to suggest
that we reject Marvel's arguments in this regard here.

Finally, we are unpersuaded by Marvel's attempts
to connect Lisa and Neal with New York through their
relationship with other family members.  Appellees' Br. at
51; see also Marvel Worldwide, Inc., 2010 WL 1655253, at *4-
*5, 2010 U.S. Dist. LEXIS 38701, at *10-*12.  The problem
with these arguments -- whether they seek to endow Lisa and
Neal with their father's jurisdictional status, or to
analyze their contacts with New York "collectively" with

1  their other siblings -- is that they identify no legal

2  mechanism by which Jack's, Barbara's, or Susan's actions

3  become those of Lisa or Neal.  Absent a bona fide agency

4  relationship -- the existence of which no one has asserted -

5  - there is no basis for imputing to Lisa and Neal actions by

6  their father half a century ago, or coincident actions by

7  their siblings who now live in New York and for that reason

8  are subject to personal jurisdiction here.  Doing so would

9  stretch the text of section 302 beyond the breaking point,

10  <u>see</u> N.Y. C.P.L.R. § 302(a) (referring to transaction of

11  business "in person or through an agent").

12        We conclude that the district court lacked

13  personal jurisdiction over Lisa and Neal Kirby.  We

14  therefore vacate the district court's judgment as against

15  those two Kirbys.

16        **II.  Compulsory Joinder**

17        The Kirbys next argue that the absence of personal

18  jurisdiction over Lisa and Neal requires vacatur of the

19  judgment as against Barbara and Susan too.  They rely on

20  Federal Rule of Civil Procedure 19: "Required Joinder of

21  Parties."

1      **A.  Federal Rule of Civil Procedure 19**

2           Rule 19 recognizes exceptional circumstances in

3      which the plaintiff's choice of parties or forum must give

4      way because of an absent party's interest in the outcome of

5      the action or involvement in the underlying dispute.  <u>See</u>

6      <u>generally</u> 7 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE

7      AND PROCEDURE § 1602 (3d ed. 2008).  The Rule's principal

8      provisions are divided into two subsections.  Subsection (a)

9      protects certain parties by deeming them "required"; a party

10     who is "required" according to the factors enumerated in

11     subsection (a) is one whose participation is so desirable or

12     important that the party must be joined so long as she or he

13     is "subject to service of process" and joinder "will not

14     deprive the court of subject-matter jurisdiction."  Fed. R.

15     Civ. P. 19(a)(1).

16          Subsection (b) addresses situations in which a

17     party otherwise "required" under subsection (a) cannot be

18     joined for some reason, for example (as in this case), want

19     of personal jurisdiction.  In such circumstances, Rule 19(b)

20     requires courts to consider whether, "in equity and good

21     conscience," the party is one without whom the action

22     between the remaining parties cannot proceed -- or, in the

23     traditional terminology, whether the absent party is

24

"indispensable."  Fed. R. Civ. P. 19(b); <u>see also</u> <u>CP</u>
<u>Solutions PTE, Ltd. v. General Electric Co.</u>, 553 F.3d 156,
159 n.2 (2d Cir. 2009) (per curiam).

     We assume, for present purposes, that Lisa and
Neal are "required" parties under Rule 19(a).  They are also
parties whose joinder is not feasible, inasmuch as we
conclude that they are not amenable to personal jurisdiction
in the Southern District of New York, and they are unwilling
to consent to suit within the jurisdiction.  The remainder
of this discussion, then, centers on the effects of Rule
19(b) on these proceedings.

     **B.  <u>Indispensability</u>**

     Because of the "flexible nature of Rule 19(b)
analysis," we review a district court's decision under that
rule for abuse of discretion.[3]  <u>Universal Reinsurance Co.,</u>
<u>Ltd. v. St. Paul Fire & Marine Ins. Co.</u>, 312 F.3d 82, 87 (2d

---

    [3]  The standard of review applicable to Rule 19(b) is
apparently the subject of a circuit split.  <u>See</u> <u>National Union</u>
<u>Fire Ins. Co. v. Rite Aid of South Carolina, Inc.</u>, 210 F.3d 246,
250 n.7 (4th Cir. 2000) (recognizing the split and collecting
cases); <u>compare Universal Reinsurance Co.</u>, 312 F.3d at 87 (abuse
of discretion), <u>with</u> <u>Keweenaw Bay Indian Community v. Michigan</u>,
11 F.3d 1341, 1346 (6th Cir. 1993) (abuse of discretion for Rule
19(a), but <u>de novo</u> for Rule 19(b)).  In <u>Republic of Philippines</u>
<u>v. Pimentel</u>, 553 U.S. 851 (2008), the Supreme Court passed on an
opportunity to resolve the question, although it did suggest that
the Rule's "in equity and good conscience" language "implies some
degree of deference to the district court," <u>id.</u> at 864.

Cir. 2002).  Here, however, the district court decided -- mistakenly, as we have explained -- that it had personal jurisdiction over Lisa and Neal.  The court therefore had no occasion to apply Rule 19(b).

It is ordinarily appropriate for us to vacate the judgment of a district court and remand the cause to it when matters committed to that court's discretion arise for the first time on appeal.  See CP Solutions, 553 F.3d at 161. But where a record is fully developed and it discloses that, in our judgment, only one possible resolution of such an issue would fall "within the permissible range of choices" -- in other words, where only one determination by the district court would be within its discretion -- there is no reason to remand.  Id.  If we did and the court decided to the contrary, we would be duty bound to reverse in any event on the grounds of abuse of discretion.

In this case, the parties have fully briefed the Rule 19(b) issue on appeal, and the facts are straightforward and undisputed.  Only one result, we think, is permissible.  We therefore resolve the issue in the first instance.[4]

---

[4]  There is some authority, albeit none from this Circuit, suggesting that a court of appeals may apply Rule 19 in the first instance when the issue arises for the first time on appeal.

1    Rule 19(b) sets forth four considerations that

2    will ordinarily be among those relevant to the analysis of

3    whether a party is "indispensable."  We have restated them

4    as: "(1) whether a judgment rendered in a person's absence

5    might prejudice that person or parties to the action, (2)

6    the extent to which any prejudice could be alleviated, (3)

7    whether a judgment in the person's absence would be

8    adequate, and (4) whether the plaintiff would have an

9    adequate remedy if the court dismissed the suit."  CP

10   Solutions, 553 F.3d at 159.

---------------------------

See, e.g., Fidelity & Casualty Co. v. Reserve Ins. Co., 596 F.2d
914, 918 (9th Cir. 1979) (considering indispensability in the
first instance on appeal in deciding applicability of Fed. R.
Civ. P. 21, which permits courts to add or drop parties to avoid
dismissing an action); Anrig v. Ringsby United, 591 F.2d 485,
489-92 (9th Cir. 1978) (faulting the district court for failing
to consider the dispensability of parties prior to dismissing the
entire case, and proceeding to address the question in the first
instance); see also Walsh v. Centeio, 692 F.2d 1239, 1241-42 (9th
Cir. 1982) (discussing case law in analysis of applicable
standard of review of dismissals under Rule 19(b)); Cloverleaf
Standardbred Owners Ass'n, Inc. v. National Bank of Washington,
699 F.2d 1274, 1277 n.5 (D.C. Cir. 1983) (suggesting, in dicta,
that a court of appeals may apply Rule 19 itself in "cases in
which Rule 19 does not figure in a district court's decision but
becomes an issue on appeal in conjunction with a jurisdiction or
venue challenge pursued by one or more of several defendants").

        That we may (or ought to) do so is perhaps born of the
notion that we have an independent equitable obligation to
protect the interests of absentee parties.  See MasterCard Int'l
Inc. v. Visa Int'l Service Ass'n, Inc., 471 F.3d 377, 382-83 (2d
Cir. 2006).  Inasmuch as we conclude that there is indeed only
one permissible outcome here, however, we need not rest our
decision on this basis.

1    Applying these factors requires an understanding
2    of the legal interests at stake, here the Kirbys'
3    termination rights under section 304(c).  Central to the
4    current discussion is paragraph (1) of section 304(c), and
5    in particular the following provision:  "In the case of a
6    grant executed by one or more of the authors of the work,
7    termination of the grant may be effected, . . . if such
8    author is dead, by the person or persons who . . . <u>own and</u>
9    <u>are entitled to exercise a total of more than one-half</u> of
10   that author's termination interest."  17 U.S.C. § 304(c)(1)
11   (emphasis added); <u>see also</u> <u>id.</u> § 304(c)(6)(C).
12    The parties interpret this to mean that at least
13   three of the four Kirbys -- "more than one-half" -- must
14   "effect" termination of their father's assignment in order
15   for any of them to realize their termination rights.
16   Appellants' Br. at 21; Appellees' Br. at 55.  So, all seem
17   to acknowledge, if Barbara and Susan Kirby are disabled by
18   an adverse judgment in this suit from effecting termination,
19   all four Kirbys lose.
20    Under this interpretation of section 304(c)(1),
21   which we assume without deciding is correct, several of the
22   possible Rule 19(b) considerations are irrelevant.  Marvel
23   cannot, and does not, complain that a judgment rendered in

1    Lisa and Neal's absence prejudices it in any way, because it
2    should be satisfied by a judgment against Barbara and Susan
3    that forecloses Lisa and Neal's rights too.  Nor can Barbara
4    and Susan claim prejudice.  Any judgment here stands to
5    reflect the full and fair adjudication of their rights under
6    section 304(c).  And whatever the result, there is no risk
7    that Barbara and Susan will somehow bear in full a legal
8    obligation that is properly shared by their absent siblings.
9    There is thus no prejudice to Marvel, Barbara, or Susan as
10   "existing parties."  Fed. R. Civ. P. 19(b)(1).

11       We also do not see how a judgment in this case
12   could be crafted to alleviate any prejudice that may exist
13   to absent parties Lisa and Neal.  See Fed. R. Civ. P.
14   19(b)(2).  The judgment here will declare the existence vel
15   non of Barbara and Susan's termination rights, and whatever
16   the practical effect of this declaration, it can do no more
17   or less.

18       Finally, although we can hardly be confident that
19   the absent parties in this case will accept a judgment as
20   the last word in this dispute, we think that any judgment
21   would be "adequate," Fed. R. Civ. P. 19(b)(3), in the sense
22   of honoring the "public stake in settling disputes by
23   wholes, whenever possible."  CP Solutions, 553 F.3d at 160

29

1    (internal quotation marks omitted).  If Marvel wins against

2    Barbara and Susan, the parties' interpretation of section

3    304(c)(1) implies that the issue is resolved as to all

4    Kirbys; if Barbara and Susan prevail, principles of issue

5    preclusion would likely bar Marvel from relitigating the

6    issue against Lisa and Neal.  See RESTATEMENT (SECOND) OF

7    JUDGMENTS § 29 (1982).

8         This leaves us with two factors to consider.  The

9    first is potential prejudice to Lisa and Neal arising from

10   their absence.  Fed. R. Civ. P. 19(b)(1).  They complain

11   that by operation of section 304(c)(1)'s "more than one-

12   half" requirement, they stand to have their legal rights

13   finally determined in their absence.  Appellants' Br. at 21-

14   22.  This argument appeals to our "'deep-rooted historic

15   tradition that everyone should have his own day in court.'"

16   See Richards v. Jefferson County, 517 U.S. 793, 798 (1996)

17   (quoting 18 CHARLES ALAN WRIGHT, ARTHUR R. MILLER, EDWARD H. COOPER,

18   FEDERAL PRACTICE AND PROCEDURE § 4449 (3d ed. 2008)).

19        But the law in this context and elsewhere

20   "'recognize[s] an exception to the general rule when, in

21   certain limited circumstances, a person, although not a

22   party, has his interests adequately represented by someone

23   with the same interests who is a party.'"  Id. (quoting

1    <u>Martin v. Wilks</u>, 490 U.S. 755, 762 n.2 (1989)).  As we

2    recognized in <u>CP Solutions</u>, the potential prejudice to an

3    absent party under Rule 19(b) is mitigated where a remaining

4    party "could champion [his or her] interest."  553 F.3d at

5    160.  And prejudice to absent parties approaches the

6    vanishing point when the remaining parties are represented

7    by the same counsel, and when the absent and remaining

8    parties' interests are aligned in all respects.  <u>Id.</u>;

9    <u>Prescription Plan Serv. Corp. v. Franco</u>, 552 F.2d 493, 497

10   (2d Cir. 1977).

11       This lawsuit concerns a single legal issue in

12   which Lisa's and Neal's interests are identical to Barbara's

13   and Susan's.  The Kirbys have the same lawyer -- who we are

14   sure was "no less vigorous in [his] advocacy," <u>Prescription</u>

15   <u>Plan Serv.</u>, 552 F.2d at 497, because he represented two

16   Kirbys instead of four.  And we have been given no reason

17   whatever to think that the proofs advanced by Barbara and

18   Susan are materially different from those Lisa and Neal

19   would have proffered.  We therefore see no practical

20   prejudice to Lisa and Neal as a result of adjudicating this

21   case in their absence.

22       The other remaining consideration is whether

23   Marvel "would have an adequate remedy if the action were

31

1    dismissed for non-joinder." Fed. R. Civ. P. 19(b)(4).  As
2    Marvel points out, because Lisa and Neal are not amenable to
3    personal jurisdiction in New York, and because Barbara and
4    Susan -- New York residents -- are, as far as the record
5    reveals, not amenable to personal jurisdiction in
6    California, the Kirbys might well be able to thwart a
7    declaratory judgment suit brought by Marvel in a forum in
8    either state.  Appellees' Br. at 56-57.  In light of the
9    nearly non-existent showing of prejudice to any of the
10   parties involved here, we see no reason to permit the Kirbys
11   to withhold consent to any suit in which the forum or
12   litigation posture are not to their liking.  See <u>Provident</u>
13   <u>Tradesmens Bank & Trust Co. v. Patterson</u>, 390 U.S. 102, 109
14   (1968) (recognizing a plaintiff's "interest in having a
15   forum").

16        We conclude, therefore, that the only
17   determination that falls within the range of permissible
18   decisions in the circumstances of this case is that Lisa and
19   Neal are not indispensable parties, and that it was
20   appropriate for the action against Barbara and Susan to have
21   proceeded on its merits.[5]

---

[5]  There is an abstract question lurking in the background:
Should a court apply the Rule to present circumstances, or
instead to the circumstances as they were at the time the party

1        **III.**   **Summary Judgment**

2            The remaining Kirbys -- Barbara and Susan --

3 challenge the district court's grant of summary judgment in

4 favor of Marvel. "We review a district court's grant of

5 summary judgment de novo. In reviewing a summary judgment

6 decision, we apply the same standards applied by the

7 district court. Under this standard, summary judgment may

8 be granted only if 'there is no genuine dispute as to any

9 material fact and the movant is entitled to judgment as a

10 matter of law.' [Fed. R. Civ. P. 56(a)]. In determining

11 whether there is a genuine dispute as to a material fact, we

12 must resolve all ambiguities and draw all inferences against

13 the moving party." Garcia v. Hartford Police Dep't, 706

---

initially made its motion for dismissal under Rule 19(b)? Compare Universal Reinsurance Co., 312 F.3d at 89 (noting, in a case in which Rule 19(b) issue did not arise until after first appeal and remand, that "[o]nce the district court has proceeded to final judgment, considerations of finality, efficiency, and economy become overwhelming, and federal courts are directed to salvage jurisdiction where possible" (internal quotation marks and citations omitted)), with Young v. Powell, 179 F.2d 147, 152 (5th Cir. 1950) (reviewing district court's Rule 19(b) analysis based on the "relief asked for" rather than the "relief granted" on the merits in order to prevent prejudice to the defendant). See generally 7 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1609 (3d ed. 2008). We need not address it, though, because we conclude that under either approach, the result would be the same: Lisa and Neal are not indispensable parties.

1    F.3d 120, 126–27 (2d Cir. 2013) (per curiam) (alteration,

2    some citations, and internal quotation marks omitted).

3                 **A.  Exclusion of Expert Testimony**

4          We address first the admissibility of the reports

5    and testimony of Barbara and Susan's putative experts, John

6    Morrow and Mark Evanier, who purported to offer historical

7    perspective concerning the relationship between Marvel and

8    Jack Kirby.  The district court ruled that the reports and

9    testimony were inadmissible.  Marvel Worldwide, Inc., 777

10   F. Supp. 2d at 729-30.  We review this decision for abuse of

11   discretion.  Wills v. Amerada Hess Corp., 379 F.3d 32, 41

12   (2d Cir. 2004).

13         Federal Rule of Evidence 702 governs the

14   admissibility of expert testimony.  It requires for

15   admissibility, among other things, that "the expert's

16   scientific, technical, or other specialized knowledge will

17   help the trier of fact to understand the evidence or to

18   determine a fact in issue."  Fed. R. Evid. 702(a).  In other

19   words, "[e]xpert testimony must be helpful to the [trier of

20   fact] in comprehending and deciding issues beyond the

21   understanding of a layperson."  DiBella v. Hopkins, 403 F.3d

22   102, 121 (2d Cir. 2005).

```
 1            We have no doubt that a historian's "specialized

 2    knowledge" could potentially aid a trier of fact in some

 3    cases.  A historian could, for example, help to identify,

 4    gauge the reliability of, and interpret evidence that would

 5    otherwise elude, mislead, or remain opaque to a layperson.

 6    See generally Maxine D. Goodman, Slipping Through the Gate,

 7    60 BAYLOR L. REV. 824, 857 (2008) (commenting that a

 8    historian's task is "to choose reliable sources, to read

 9    them reliably, and to put them together in ways that provide

10    reliable narratives about the past" (quoting MARTHA C. HOWELL

11    & WALTER PREVENIER, FROM RELIABLE SOURCES: AN INTRODUCTION TO HISTORICAL

12    METHODS 2 (2001))).  He or she might helpfully synthesize

13    dense or voluminous historical texts.  Id.  Or such a

14    witness might offer background knowledge or context that

15    illuminates or places in perspective past events.  See,

16    e.g., Int'l Soc. for Krishna Consciousness, Inc. v. Barber,

17    650 F.2d 430, 440 (2d Cir. 1981) ("In fact, one religious

18    expert at trial remarked that the American movement is 'one

19    of the most unusual examples of transfer of a cultural

20    tradition across broad national and cultural barriers.'

21    This evidence of historical longevity and theological

22    consistency should not be ignored.").
```

35

1          But Morrow and Evanier do not bring their

2     expertise to bear in any such way.  As the district court

3     recognized, their reports are by and large undergirded by

4     hearsay statements, made by freelance artists in both formal

5     and informal settings, concerning Marvel's general practices

6     towards its artists during the relevant time period.  See,

7     e.g., Deposition of Mark Evanier, Dec. 6, 2010, at 18-21,

8     Joint App'x at 957-59.  Drawing from these statements, they

9     then speculate as to the motivations and intentions of

10    certain parties, see, e.g., Expert Report of John Morrow at

11    9, Joint App'x at 1152 ("I do not believe that Goodman, Lee,

12    Marvel or the freelance artists, like Jack Kirby,

13    . . . thought that the material they created was 'work made

14    for hire' . . . ."), or opine on the credibility of other

15    witnesses' accounts, see, e.g., Expert Report of Mark

16    Evanier at 14, Joint App'x at 1105 ("I have great respect

17    and personal affection for Stan Lee, but I disagree with the

18    accounts he has sometimes given . . . .").

19         Although the Rules permit experts some leeway with

20    respect to hearsay evidence, Fed. R. Evid. 703, "a party

21    cannot call an expert simply as a conduit for introducing

22    hearsay under the guise that the testifying expert used the

23    hearsay as the basis of his testimony."  Malletier v. Dooney

1  & Bourke, Inc., 525 F. Supp. 2d 558, 666 (S.D.N.Y. 2007).

2  The appropriate way to adduce factual details of specific

3  past events is, where possible, through persons who

4  witnessed those events.  And the jobs of judging these

5  witnesses' credibility and drawing inferences from their

6  testimony belong to the factfinder.  See Nimely v. City of

7  New York, 414 F.3d 381, 397-98 (2d Cir. 2005).  We therefore

8  think the district court clearly did not abuse its

9  discretion in declining to admit this evidence.

10                **B.  Termination Rights and Work Made for Hire**

11            We thus, at last, arrive at the merits of Marvel's

12  summary judgment motion.  At issue is section 304(c) of the

13  Copyright Act of 1976, which, insofar as bears on this

14  litigation, provides:

15                Termination of Transfers and Licenses
16                Covering Extended Renewal Term. -- In the
17                case of any copyright subsisting in
18                either its first or renewal term on
19                January 1, 1978, other than a copyright
20                in a work made for hire, the exclusive or
21                nonexclusive grant of a transfer or
22                license of the renewal copyright or any
23                right under it, executed before January
24                1, 1978 . . . is subject to
25                termination . . . .

26  17 U.S.C. § 304(c).[6]

_____

        [6]  The termination right in section 304(c) applies only to
transfers executed by the author prior to January 1, 1978.
Section 203 governs termination of transfers of the rights to

1
2      If the author is no longer alive, section

3  304(c)(2) grants his or her termination rights to specified

4  heirs.  See id. § 304(c)(2)(B).  The provision "protect[s]

5  the property rights of widows and children in copyrights" by

6  granting them the power to undo earlier transfers and to

7  enjoy the remainder of the copyright term.[7]  Larry Spier,

8  Inc. v. Bourne Co., 953 F.2d 774, 778 (2d Cir. 1992).

9      But section 304(c) provides that termination

10 rights under that section do not exist with respect to

11 "work[s] made for hire."  17 U.S.C. § 304(c).  Where a work

12 is "made for hire," copyright law deems the employer to be

13 the "author" for purposes of copyright ownership.  Copyright

14 Act of 1909 § 62 (formerly codified at 17 U.S.C. § 26)

15 ("[T]he word 'author' shall include an employer in the case

---

works executed on or after January 1, 1978.  See 17 U.S.C.
§ 203(a).  We have cautioned that "Section 203 and Section 304
are different provisions involving different rights."  Larry
Spier, Inc. v. Bourne Co., 953 F.2d 774, 779 (2d Cir. 1992).

    [7]  Thirty-nine years, to be precise.  Termination rights may
be effected "during a period of five years beginning at the end
of fifty-six years from the date copyright was originally
secured, or beginning on January 1, 1978, whichever is later."
17 U.S.C. § 304(c)(3).  Under section 304, as amended by the
Sonny Bono Copyright Term Extension Act, the full copyright term
of the works at issue -- consisting of a 28-year initial term
plus a 67-year renewal term -- is 95 years.  See 17 U.S.C.
§ 304(a), (b).  At stake here, then, is the 39 years that will be
remaining on each of the works' copyright terms at the time they
turn 56.

1    of works made for hire."); see also Copyright Act of 1976

2    § 201(b), 17 U.S.C. § 201(b) ("In the case of a work made

3    for hire, the employer or other person for whom the work was

4    prepared is considered the author for purposes of this

5    title . . . ."). The hired party, although "the 'author' in

6    the colloquial sense," Shapiro, Bernstein & Co. v. Bryan,

7    123 F.2d 697, 699 (2d Cir. 1941), therefore never owned the

8    copyrights to assign. It stands to reason, then, that there

9    are no rights the assignment of which his or her heirs may

10   now terminate.

11         Marvel argues that all of the works at issue in

12   this case fall into the category of "work made for hire."

13         **1.  The Instance and Expense Test.**  To determine

14   whether a work is "work made for hire" within the meaning of

15   section 304(c), we apply case law interpreting that term as

16   used in the 1909 Act, the law in effect when the works were

17   created.  See Estate of Burne Hogarth v. Edgar Rice

18   Burroughs, Inc., 342 F.3d 149, 156-63 (2d Cir. 2003).  This

19   requires us to apply what is known as the "instance and

20   expense test."

21         **a.  Origins.**

22         The origins of the instance and expense test were

23   described at some length by Judge Newman's opinions in

39

1    <u>Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc.</u>,

2    <u>supra</u>, and <u>Martha Graham School and Dance Foundation, Inc.</u>

3    <u>v. Martha Graham Center of Contemporary Dance, Inc.</u>, 380

4    F.3d 624, 633-36 (2d Cir. 2004).

5          The test was developed from two lines of cases.

6    One was our court-made work-for-hire jurisprudence.

7    "Because the 1909 Act did not define 'employer' or 'works

8    made for hire,' the task of shaping these terms fell to the

9    courts." <u>Community for Creative Non-Violence v. Reid</u>, 490

10    U.S. 730, 744 (1989).  Using <u>Bleistein v. Donaldson</u>

11    <u>Lithographing Co.</u>, 188 U.S. 239, 248 (1903) -- the Supreme

12    Court's first encounter with the work-for-hire phenomenon --

13    as a guidepost, our early cases focused principally on

14    whether the work at issue was created within the scope of a

15    traditional employment relationship.  <u>See, e.g.</u>, <u>Tobani v.</u>

16    <u>Carl Fischer, Inc.</u>, 98 F.2d 57, 59 (2d Cir. 1938); <u>Shapiro,</u>

17    <u>Bernstein & Co., Inc. v. Bryan</u>, 123 F.2d 697, 698-700 (2d

18    Cir. 1941).  Work-for-hire doctrine thus served to identify

19    which party within the traditional employment relationship

20    was the statutory "author," and hence owned the copyright in

21    the work from the time of creation.

22          The second doctrine developed to address what was

23    initially considered a separate issue under the 1909 Act:

1    rights in commissioned works created by independent

2    contractors.  The issue in this situation, at least in the

3    early cases, was not who the statutory author was -- the

4    author was the independent contractor.  The issue was

5    whether the hiring party nevertheless owned copyrights by

6    way of the author's implied assignment of those rights; and,

7    if so, whether the assignment applied to only the "original"

8    copyright term, or to both the "original" term and an

9    "expectancy" in the so-called "renewal" term.

10         We addressed the first half of this issue in

11   Yardley v. Houghton Mifflin Co., 108 F.2d 28 (2d Cir. 1939).

12   There we concluded that if a party "is solicited by a patron

13   to execute a commission for pay, the presumption should be

14   indulged that the patron desires to control the publication

15   of copies and that the artist consents that he may, unless

16   by the terms of the contract, express or implicit, the

17   artist has reserved the copyright to himself."  Id. at 31.

18   And in later cases, we seemed to answer the second half,

19   limiting Yardley's presumption in favor of implied

20   assignment to the original term.  See Estate of Burne

21   Hogarth, 342 F.3d at 159; Shapiro, Bernstein & Co. v. Jerry

22   Vogel Music Co., 221 F.2d 569, 570 (1955).

41

1       The two doctrines first converged in <u>Brattleboro</u>

2  <u>Publishing Co. v. Winmill Publishing Corp.</u>, 369 F.2d 565,

3  567 (2d Cir. 1966).  That case concerned rights in the

4  original term in an independent contractor setting -- like

5  in <u>Yardley</u> -- but we nevertheless began our analysis by

6  discussing traditional work-for-hire doctrine.  <u>Id.</u> at 567.

7  We relied on Professor Melville Nimmer's copyright treatise,

8  which we described as recognizing "a presumption in the

9  absence of an express contractual reservation to the

10 contrary, that the copyright shall be in the person at whose

11 <u>instance and expense</u> the work is done."  <u>Id.</u> (emphasis

12 added) (citing NIMMER ON COPYRIGHT 238 (1964)).  And we could

13 "see no sound reason why these same principles are not

14 applicable when the parties bear the relationship of

15 employer and independent contractor."  <u>Id.</u> at 568.

16      This discussion does not appear to have been

17 necessary to the result inasmuch as the Court went on to

18 resolve the case on the grounds of <u>Yardley</u>'s presumption.

19 <u>Id.</u>  Just as curious was the <u>Brattleboro</u> Court's attribution

20 of the phrase "instance and expense" to Professor Nimmer.

21 The phrase is apparently not to be found in the cited

22 passage on work-for-hire doctrine.  <u>See</u> MELVILLE B. NIMMER &

23 DAVID NIMMER, NIMMER ON COPYRIGHT § 5.03 n.171b (Matthew Bender,

1    Rev. Ed. 2013).  It seems instead to be drawn from a Ninth

2    Circuit opinion in an independent contractor case published

3    the year before.  See Lin-Brook Builders Hardware v.

4    Gertler, 352 F.2d 298, 300 (9th Cir. 1965); see generally

5    Martha Graham, 380 F.3d at 634 n.17.

6         But we effectively adopted the union of these two

7    approaches in Picture Music, Inc. v. Bourne, Inc., 457 F.2d

8    1213, 1216 (2d Cir. 1972), relying on both work-for-hire and

9    implied assignment cases to conclude that an independent

10   contractor's works were "made for hire," and therefore that

11   the hiring party owned both the original and renewal term.

12   Id. at 1216.  And when we next confronted the issue, in

13   Playboy Enterprises, Inc. v. Dumas, 53 F.3d 549, 554 (2d

14   Cir. 1995), we explained that "an independent contractor is

15   an 'employee' and a hiring party an 'employer' for purposes

16   of the [1909 Act] if the work is made at the hiring party's

17   'instance and expense.'"[8]

_____

    [8]  Our approach has been criticized.  See NIMMER ON COPYRIGHT
§ 9.03[D].  It was also called into question by language in
Community for Creative Non-Violence v. Reid, 490 U.S. 730, 744
(1989), which discussed some of our cases as background to
interpreting the 1976 Act's somewhat different "work made for
hire" provisions, 17 U.S.C. § 101.  We nonetheless reaffirmed our
adherence to the instance and expense test in cases turning on
the interpretation of the 1909 Act's work-for-hire provisions in
Estate of Burne Hogarth, supra.

1          **b.  General Principles**

2          We have stated as a general rule that "[a] work is

3   made at the hiring party's 'instance and expense' when the

4   employer induces the creation of the work and has the right

5   to direct and supervise the manner in which the work is

6   carried out."  <u>Martha Graham</u>, 380 F.3d at 635.  Our case law

7   is, however, not so tidy.  To the extent we can distill from

8   our prior cases a set of principles applicable here, they

9   are these:

10          "Instance" refers to the extent to which the

11  hiring party provided the impetus for, participated in, or

12  had the power to supervise the creation of the work.  Actual

13  creative contributions or direction strongly suggest that

14  the work is made at the hiring party's instance.  <u>See, e.g.</u>,

15  <u>Playboy Enterprises, Inc.</u>, 53 F.3d at 556 (evidence that

16  independent contractor "was given specific instructions for

17  his early submissions to Playboy" suggested work for hire);

18  <u>Yardley</u>, 108 F.2d at 30-31 ("[W]here a photographer takes

19  photographs of a person who goes or is sent to him in the

20  usual course, and is paid for the photographs and for his

21  services in taking them, the right of copyright is in the

22  sitter or in the person sending the sitter to be

23  photographed, and not in the photographer . . . .").

44

1          The "right to direct and supervise the manner in

2     which the work is carried out," <u>Martha Graham</u>, 380 F.3d at

3     635, moreover, even if not exercised, is in some

4     circumstances enough to satisfy the "instance" requirement.

5     It may be sufficient, for example, where the hiring party

6     makes a particularly strong showing that the work was made

7     at its expense, <u>Scherr v. Universal Match Corp.</u>, 417 F.2d

8     497, 501 (2d Cir. 1969) (noting "the overwhelming

9     appropriation of [the hiring party's] funds, time and

10    facilities to the project"), or where prior dealings between

11    the parties on similar assignments, as part of an ongoing

12    arrangement, have rendered fine-grained supervision

13    unnecessary, <u>Playboy Enterprises, Inc.</u>, 53 F.3d at 556

14    ("right to control" and exercise of control with respect to

15    "certain characteristics" sufficient in light of earlier

16    "specific assignments").

17         But "inducement" or "control" alone can be

18    incidental enough not to vest copyright ownership in the

19    hiring party.  For example, in <u>Siegel v. National Periodical</u>

20    <u>Publications, Inc.</u>, 508 F.2d 909, 914 (2d Cir. 1974), we

21    concluded that it was insufficient that the independent

22    contractor "revise[d] and expand[ed] the Superman material

23    at the request of the [hiring party]," because "Superman had

45

1  been spawned by the [independent contractor] four years

2  before the relationship [with the hiring party] existed."

3  Indeed, even in cases arising under traditional employment

4  law, a work created "as a special job assignment" may not be

5  a "work made for hire." Shapiro, Bernstein & Co., 221 F.2d

6  at 570.

7        The "expense" component refers to the resources

8  the hiring party invests in the creation of the work.  We

9  have, at least in some cases, continued the tradition of

10 treating the incidents of a traditional employment

11 relationship as relevant to the analysis.  See, e.g., Martha

12 Graham, 380 F.3d at 637-41.  We have, moreover, suggested

13 that the hiring party's provision of tools, resources, or

14 overhead may be controlling.  Id. at 638 ("It may well be

15 that the resources of the Center -- notably, its rehearsal

16 space and the dancers enrolled at the School --

17 significantly aided Graham in her choreography, thereby

18 arguably satisfying the 'expense' component . . . .").  But

19 cf. Playboy Enterprises, Inc., 53 F.3d at 555 (finding that

20 factors relevant to work for hire analysis under the 1976

21 Act, like setting hours or providing tools, have "no bearing

22 on whether the work was made at the hiring party's

23 expense").

1          In other cases, however, we seem to have focused

2     mostly on the nature of payment: payment of a "sum certain"

3     suggests a work-for-hire arrangement; but "where the creator

4     of a work receives royalties as payment, that method of

5     payment generally weighs against finding a work-for-hire

6     relationship."  <u>Playboy Enterprises, Inc.</u>, 53 F.3d at 555.

7     We note, though, that this distinction appears to be a

8     rather inexact method of properly rewarding with ownership

9     the party that bears the risk with respect to the work's

10    success.  <u>See Twentieth Century Fox Film Corp. v.</u>

11    <u>Entertainment Distributing</u>, 429 F.3d 869, 881 (9th Cir.

12    2005) (noting that publisher took on "all the financial risk

13    of the book's success"); <u>see also Donaldson Publishing Co.</u>

14    <u>v. Bregman, Vocco & Conn, Inc.</u>, 375 F.2d 639, 643 (2d Cir.

15    1967) (finding relevant employee's "freedom to engage in

16    profitable outside activities without sharing the proceeds

17    with [the hiring party]").

18         Our case law counsels against rigid application of

19    these principles.  Whether the instance and expense test is

20    satisfied turns on the parties' creative and financial

21    arrangement as revealed by the record in each case.

22         If the hiring party is able to satisfy the

23    instance and expense test, it "is presumed to be the author

47

1    of the work," and the independent contractor can overcome

2    the presumption only "by evidence of an agreement to the

3    contrary."[9] <u>Playboy Enterprises, Inc.</u>, 53 F.3d at 556.

4         **2.    Application of the Instance and Expense Test**

5    **in the Present Case.**  Applying these principles to the facts

6    in the record before us -- a challenging endeavor in some

7    respects[10] -- we conclude that the works were created at

8    Marvel's instance and expense, and that Barbara and Susan

9    have not adduced evidence of an agreement to the contrary

---

[9]  Marvel sees this as a formal "burden shifting framework."
Under that framework, as Marvel conceives of it, the hiring party
must "come forward with 'some credible evidence' that the Works
were created at its instance and expense," from which showing
"arises an 'almost irrebuttable presumption' that the Works were
works made for hire."  Appellees' Br. at 22 (citations omitted).
Neither the "some credible evidence" statement -- a cherry-picked
comment from a Ninth Circuit opinion, <u>see</u> <u>Twentieth Century</u>, 429
F.3d at 877 -- nor the "almost irrebuttable presumption" language
-- a Fifth Circuit opinion's description of our approach, noted
in our opinion in <u>Estate of Burne Hogarth</u>, 342 F.3d at 158
(quoting <u>Easter Seal Society for Crippled Children & Adults of
Louisiana, Inc. v. Playboy Enterprises</u>, 815 F.2d 323, 327 (5th
Cir. 1987)) -- is an accurate statement of our case law.

[10]  The facts underlying this dispute took place decades
ago, and Jack Kirby is, of course, no longer alive to provide an
account of his working relationship with Marvel during the
relevant time period.  This leaves us to reconstruct the
arrangement through (1) the deposition testimony of Stan Lee,
whose credibility the Kirbys contest; (2) the depositions and
declarations of other comic book artists who worked for Marvel at
various times, but likely under different arrangements from
Kirby's; (3) the depositions of the Kirby children, who have
little direct knowledge; and (4) some documentary evidence
concerning Kirby's contributions to or creation of some of the
works.

1   contemporaneous with the creation of the works.  We

2   therefore conclude that the district court was correct to

3   award summary judgment in favor of Marvel.

4        **a.  Instance.**

5        The evidence, construed in favor of the Kirbys,

6   establishes beyond dispute that the works in question were

7   made at Marvel's instance.

8        Although Jack Kirby was a freelancer, his working

9   relationship with Marvel between the years of 1958 and 1963

10  was close and continuous.  Stan Lee considered Kirby to be

11  Marvel's best artist, Lee Dep. at 30, Joint App'x at 2450,

12  an assessment reinforced by the admiration of Kirby by his

13  contemporaries, see Deposition of Lawrence Lieber ("L.

14  Lieber Dep."), Jan. 7, 2011, at 104-05, Joint App'x at 1530-

15  31; Deposition of John Romita ("Romita Dep."), Oct. 21,

16  2010, at 75-76, Joint App'x at 360-61.  Lee "wanted to use

17  Jack for everything," Lee Dep. at 36, Joint App'x at 2456,

18  and Kirby appears to have been kept busy with assignments

19  from Marvel, id. at 37, Joint App'x at 2457.

20       Marvel published the great majority of Kirby's

21  work during these years -- 1958 through 1963.  There are

22  indications in the record that artists did customarily work

23  with more than one publisher during the relevant time

49

1    period, <u>see, e.g.</u>, L. Lieber Dep. at 74-75, Joint App'x at

2    1521-22, and a handful of Kirby's works between 1958 and

3    1963 were not published by Marvel, <u>see</u> Excerpt of JACK KIRBY

4    CHECKLIST (Two Morrows Gold ed. 2008), Joint App'x at 1751-

5    62.  But it is beyond dispute that most of Kirby's work

6    during this period was published by Marvel and for

7    established Marvel titles.  <u>Id.</u>

8         Understood as products of this overarching

9    relationship, Kirby's works during this period were hardly

10    self-directed projects in which he hoped Marvel, as one of

11    several potential publishers, might have an interest;

12    rather, he created the relevant works pursuant to Marvel's

13    assignment or with Marvel specifically in mind.  Kirby's

14    ongoing partnership with Marvel, however unbalanced and

15    under-remunerative to the artist, is therefore what induced

16    Kirby's creation of the works.

17         Marvel also played at least some creative role

18    with respect to the works.  Kirby undoubtedly enjoyed more

19    creative discretion than most artists did under the "Marvel

20    Method," a fact Lee readily admits.  Lee Dep. at 70, Joint

21    App'x at 2490.  But the only evidence on the issue indicates

22    that he did not work on "spec" (speculation) -- that is, he

23    worked within the scope of Marvel's assignments and titles.

50

1    Id. at 48, Joint App'x at 2468; Deposition of Neal Kirby,

2    June 30, 2010, at 167-68, Joint App'x at 1592-93.  There is

3    no disputing, moreover, that Marvel had the power to reject

4    Kirby's pages and require him to redo them, or to alter

5    them, a power it exercised from time to time.  Id. at 234-

6    35, Joint App'x at 1599-1600; Deposition of Susan Kirby,

7    Oct. 25, 2010, at 37, Joint App'x at 1607.  And there is

8    evidence that Kirby collaborated with Lee with respect to

9    many of the works.  Lee Dep. at 118, Joint App'x at 2538.

10         Marvel's inducement, right to supervise, exercise

11   of that right, and creative contribution with respect to

12   Kirby's work during the relevant time period is more than

13   enough to establish that the works were created at Marvel's

14   instance.

15         The Kirbys' attempts to avoid this conclusion are

16   unsuccessful.  Their argument is that the "right to

17   supervise" referred to in our case law requires a legal,

18   presumably contractual, right.  Appellants' Br. at 42-45.

19   We find no hint of this requirement in our case law applying

20   the instance and expense test.  Nor do the Kirbys provide a

21   principled reason why Marvel's active involvement in the

22   creative process, coupled with its power to reject pages and

23   request that they be redone, should not suffice.

1          The Kirbys also point to factual disputes over who

2    actually created the characters, plots, and other concepts

3    in Marvel's comic books during the relevant time period,

4    mostly in an attempt to discredit Lee and find fault in the

5    district court's reading of the record.  Appellants' Br. at

6    33-35.  Questions of who created the characters are mostly

7    beside the point.  That Marvel owes many of its triumphs to

8    Kirby is beyond question.  But the hired party's ingenuity

9    and acumen are a substantial reason for the hiring party to

10    have enlisted him.  It makes little sense to foreclose a

11    finding that work is made for hire because the hired artist

12    indeed put his exceptional gifts to work for the party that

13    contracted for their benefit.

14          **b.**  **Expense.**

15          Whether the Works were created at Marvel's expense

16    presents a more difficult question.  We ultimately find

17    ourselves in agreement with the district court and in favor

18    of Marvel here too.

19          The facts underlying the expense component are not

20    in dispute.  Marvel paid Kirby a flat rate per page for

21    those pages it accepted, and no royalties.  It did not pay

22    for Kirby's supplies or provide him with office space.  It

23    was free to reject Kirby's pages and pay him nothing for

1   them.  The record contains anecdotal evidence that Marvel

2   did in fact reject Kirby's work or require him to redo it on

3   occasion, if less often than it did the work of other

4   artists, but with what frequency is unclear.

5          Marvel argues that its payment of a flat rate for

6   Kirby's pages is all that matters.  It relies on our

7   suggestion in <u>Playboy Enterprises</u>, 53 F.3d at 555, that "the

8   'expense' requirement [is] met where a hiring party simply

9   pays an independent contractor a sum certain for his or her

10   work."  Because, Marvel argues, it paid Kirby a sum certain

11   when it accepted his pages -- irrespective of whether the

12   pages required edits or additions, were ultimately

13   published, or were part of a comic book that was a

14   commercial success -- it took on the risk of financial loss.

15          The Kirbys urge us to focus not on the risk Marvel

16   took at the time it purchased the pages, but on the risk

17   Kirby took when he set out to create them.  Until Marvel

18   purchased Kirby's pages, they point out, Kirby had

19   undertaken all of the costs of producing the drawings --

20   time, tools, overhead -- and shouldered the risk that Marvel

21   would reject them, leaving him in the lurch.  Marvel's

22   purely contingent payment, they argue, thus acted more like

23   a royalty than a sum certain.  Appellants' Br. at 36-42.

```
 1              This argument might give us pause if Kirby's
 2      relationship with Marvel comprised discrete engagements with
 3      materially uncertain prospects for payment, or, indeed, if
 4      he undertook to create the works independent of Marvel.  But
 5      there is no evidence of which we are aware to either effect.
 6      The evidence suggests instead that Marvel and Kirby had a
 7      standing engagement whereby Kirby would produce drawings
 8      designed to fit within specific Marvel universes that his
 9      previously purchased pages had helped to define.  When Kirby
10      sat down to draw, then, it was not in the hope that Marvel
11      or some other publisher might one day be interested enough
12      in them to buy, but with the expectation, established
13      through their ongoing, mutually beneficial relationship,
14      that Marvel would pay him.  And the record makes clear that
15      in the run of assignments, this expectation proved
16      warranted.
17              Kirby's completed pencil drawings, moreover, were
18      generally not free-standing creative works, marketable to
19      any publisher as a finished or nearly finished product.
20      They built on preexisting titles and themes that Marvel had
21      expended resources to establish -- and in which Marvel held
22      rights -- and they required both creative contributions and
23      production work that Marvel supplied.  That the works are
```

1   now valuable is therefore in substantial part a function of

2   Marvel's expenditures over and above the flat rate it paid

3   Kirby for his drawings.

4           In the final analysis, then, the record suggests

5   that both parties took on risks with respect to the works'

6   success -- Kirby that he might occasionally not be paid for

7   the labor and materials for certain pages, and Marvel that

8   the pages it did pay for might not result in a successful

9   comic book.  But we think that Marvel's payment of a flat

10  rate and its contribution of both creative and production

11  value, in light of the parties' relationship as a whole, is

12  enough to satisfy the expense requirement.

13          **c.  Agreement to the Contrary.**

14          Because Marvel has satisfied the instance and

15  expense test, a presumption arises that the works in

16  question were "works made for hire" under section 304(c).

17  This presumption can be overcome only by evidence of an

18  agreement to the contrary contemporaneous with the creation

19  of the works.

20          The Kirbys' showing in this regard consists mostly

21  of negative or elliptical inferences concerning the parties'

22  agreement at the time.  For example, they point to a 1975

23  assignment executed by Jack Kirby that purported to transfer

interests in certain works to Marvel (but also averred that
all of his work was for hire), which they say suggests the
parties' understanding that Marvel did not already own the
rights.  Appellants' Br. at 48.  They also call to our
attention evidence that indicates that Marvel paid Kirby
during the relevant time periods with checks that contained
a legend with assignment, instead of work-for-hire,
language.  Id. at 47.

       This evidence is not enough to enable the Kirbys
to survive the motion for summary judgment.  Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 252 (1986) ("The mere
existence of a scintilla of evidence in support of the [non-
movant's] position will be insufficient; there must be
evidence on which the jury could reasonably find for the
[non-movant]."); Bickerstaff v. Vassar Coll., 196 F.3d 435,
448 (2d Cir. 1999) ("[A]n inference is not a suspicion or a
guess." (internal quotation marks omitted)).  It is all too
likely that, if the parties thought about it at all, Kirby's
assignments at the time he was paid or later were
redundancies insisted upon by Marvel to protect its rights;
we decline to infer from Marvel's suspenders that it had
agreed to give Kirby its belt.

                         *  *  *

```
1          In sum, the district court made no error, in our
2     view, in determining as a matter of law that the works were
3     made at Marvel's instance and expense, and that the parties
4     had no agreement to the contrary.  The remaining Kirbys,
5     Barbara and Susan, are therefore without termination rights
6     under section 304(c), and the district court properly
7     granted Marvel's motion for summary judgment as to them.
```

**CONCLUSION**

```
9          For the foregoing reasons, we vacate the district
10    court's judgment as against Lisa and Neal Kirby and remand
11    with instructions to the district court to dismiss the
12    action against them for want of personal jurisdiction.  We
13    affirm the judgment in favor of Marvel as against Barbara
14    and Susan Kirby.  Each party shall bear his, her, or its own
15    costs.
```

A True Copy

Catherine O'Hagan Wolfe, Clerk

United States Court of Appeals, Second Circuit